**In the Matter of OLSEN INDUSTRIES, INC. and T. Frederick Jackson, Inc., Debtors.**

**Bankruptcy Nos. 94–1040, 94–1041(HSB).**

United States Bankruptcy Court, D. Delaware.

Nov. 13, 1997.

**52**

Stephen W. Spence, Phillips, Goldman & Spence, P.A., Wilmington, DE, Walter H. Flamm, Jr., Pace Reich, Flamm, Boroff & Bacine, P.C., Blue Bell, PA, for debtor.

Teresa K.D. Currier, Duane, Morris & Heckscher LLP, Wilmington, DE, David T. Sykes, Mark J. Packel, Duane, Morris & Heekscher LLP, Philadelphia, PA, for Pepper, Hamilton & Scheetz LLP.

### MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Chief Judge.

For the first two years of its bankruptcy case, Chapter 11 debtor T. Frederick Jackson, Inc. was represented by the law firm of Pepper, Hamilton and Scheetz LLP. On November 22, 1996, the Pepper law firm withdrew from its representation of the debtor. The debtor, now represented by Flamm, Boroff & Bacine, asks this court to direct the disgorgement of fees and expenses totaling about $1,300,000.00 which the Pepper law firm billed and received on an interim basis during the course of its representation of the debtor. The basis for this disgorgement request is the debtor's' assertion that the Pepper law firm possessed a conflict of interest relating to the debtor's major creditor, and that the Pepper law firm failed to disclose to the court and parties in interest the facts underlying this conflict. This is the court's Opinion in this core matter, 28 U.S.C. § 157(b)(2)(A) & (E).

### I. *Facts*

A full evidentiary hearing was held in this contested matter. In addition, the parties submitted a lengthy stipulation of facts. Because of the nature of the issues arising out of T. Frederick Jackson's disgorgement mo-

tion, the court's findings of facts start many years before the Chapter 11 case was commenced.

T. Frederick Jackson, Inc. was an electrical contracting company. Olsen Industries, Inc. owned all of the stock of Jackson. Fred Olsen held 62% of the stock of Olsen Industries, and was the President of T. Frederick Jackson. Fidelity & Deposit Co. of Maryland provided payment and performance surety bonds for certain construction projects. In 1977, Jackson, Olsen Industries, and Mr. Olsen ("the indemnitors") executed an agreement of indemnity with F & D, in which the indemnitors agreed to repay F & D for all losses, costs and expenses incurred in connection with any bonds issued by F & D for Jackson.

Morse Diesel was and is a general contracting company. In 1982, it entered into a construction agreement with the Times Square Hotel Company to build a Marriot Marquis Hotel in New York City. Morse Diesel subcontracted the electrical work to Jackson. Jackson provided to Morse Diesel a performance bond and a payment bond from F & D. Construction difficulties occurred with the Marriot project. In February 1985, Morse Diesel notified Jackson that it was in default of the performance bond, and demanded of F & D that it remedy Jackson's default. Over the next eleven years, there were many disputes as well as lawsuits involving these three parties.

One of these lawsuits was filed in the United States District Court for the Southern District of New York and shall be referred to as the Morse Diesel litigation or action. In April 1986, F & D joined T. Frederick Jackson as a third party defendant in this action. Jackson filed a counterclaim for millions of dollars against Morse Diesel.

T. Frederick Jackson was initially represented by Kornstein, Viesz & Wexler in this action. From 1992 onwards. Jackson did not have funds available to pay the legal fees or expenses of the Kornstein firm. At Jackson's request, F & D paid or reimbursed the company for the Kornstein firm's fees and expenses.

In January 1993, Jackson replaced the Kornstein law firm with that of Pepper, Hamilton, and Scheetz. Since F & D was paying for the fees of Pepper, Hamilton, and Scheetz, the Pepper firm did not want to be put in a position where Jackson directed the firm to sue F & D, F & D cut off the funding, and then Pepper, Hamilton, and Scheetz would be stuck in the litigation without being paid. For these reasons, on October 15, 1993, Kenneth M. Cushman, Esquire of Pepper, Hamilton, and Scheetz sent Fred Olsen on behalf of T. Frederick Jackson an engagement letter which provided that:

Pepper will not represent T. Frederick Jackson, yourself or any of the indemnitors in connection with any matter where T. Frederick Jackson, yourself or any indemnitor may be adverse to F & D ...

... In addition, inasmuch as Pepper will be working closely with F & D and F & D's attorneys, Jackson agrees that Pepper can share attorney/client confidences with F & D and their attorneys with respect to the prosecution and defense of the Morse Diesel litigation.... F & D has an obligation to fund the attorney's fees ... associated with the Morse Diesel litigation. [I]n the event that Pepper's invoices are not paid in a timely fashion, Pepper has a right to withdraw as counsel in the Morse Diesel litigation without regard to whether an appearance for replacement counsel is entered.

Docket no. 338, ¶ 30.

In 1994, events occurred that led to the bankruptcy filings in this court. Certain plaintiffs in a civil action obtained judgments against Jackson, Olsen, and Olsen Industries. The defendants believed these plaintiffs were attempting to obtain control over Jackson's claims in the Morse Diesel litigation by executing on the judgments in the civil action. Jackson consulted with Pepper, Hamilton, and Scheetz concerning bankruptcy as a method of halting the execution process. Among other things, Pepper, Hamilton, and Scheetz advised Jackson that it could not represent Olsen Industries, the parent company, in a bankruptcy proceeding. Olsen Industries engaged another law firm for bankruptcy advice. F & D agreed to pay Jackson for its bankruptcy counsel, to pay Olsen for his bankruptcy counsel, and to provide funding for Olsen Industries to pay for its bankruptcy counsel.

On September 6, 1994, Jackson, Olsen Industries, Fred and Joyce Olsen entered into an agreement with F & D which is very significant in connection with the present disgorgement motion. The agreement provided that F & D had the unilateral right to settle the Morse Diesel litigation, and that with respect to the division of the proceeds of any judgment or settlement in that litigation. Jackson would receive 15%, and F & D would receive 85%.

On October 31, 1994. T. Frederick Jackson, Olsen Industries, and Fred Olsen each filed a Chapter 11 bankruptcy petition (Mr. Olsen filed his petition in another jurisdiction). In the Jackson case, an application was filed that day seeking to employ the law firm of Pepper, Hamilton, and Scheetz to serve as bankruptcy counsel, and to serve as lead litigation counsel in the Morse Diesel litigation. Attached to the application was an affidavit of Francis J. Lawall, Esquire of the Pepper firm which purported to disclose all interests of the firm relating to the debtor. Also attached to the application was a statement pursuant to Federal Rule of Bankruptcy Procedure 2016(b). The affidavit will be discussed in detail in section II of this Opinion. Also that first day, Jackson filed a motion for preliminary approval of a financing agreement with F & D.

Meanwhile, the Morse Diesel litigation proceeded. A bench trial was conducted in July 1995. An opinion and judgment was entered holding Morse Diesel liable to T. Frederick Jackson for over two million dollars plus post-judgment interest. Appeals were filed by Morse Diesel and Jackson. The trial court's rulings were affirmed in August 1996.

At times during the bankruptcy proceedings, there were disagreements between Olsen and the Pepper firm as to how the bankruptcy case and the Morse Diesel litigation should proceed. Eventually, on November 22, 1996, Pepper, Hamilton, and Scheetz withdrew as counsel.

On December 16, 1996, over two years after it filed its Chapter 11 petition, and at this time represented by Flamm, Boroff & Bacine, P.C., Jackson filed a motion to assume certain unexpired agreements, including a portion of the September 6, 1994 agreement. Docket no. 165. As stated in that motion, the debtor held over $5 million in an investment account from the Morse Diesel judgment, and the debtor wanted to distribute it pursuant to the September agreement. F & D objected to the motion.

At the conclusion of a related hearing involving F & D and the debtor, this court ruled upon the issues raised by the motion to assume. The court ruled that paragraph six of the September 6, 1994 agreement could be assumed, that F & D had a lien on the Morse Diesel proceeds as to its post-petition financing, and that an amount equal to the amount of the lien would be paid first from the Morse Diesel monies to F & D. The remainder of those monies would be paid pursuant to paragraph six of the agreement, which entitled the debtor to certain cash proceeds, and required an exchange of releases. Case no. 94–1041, A.P. No. 96–204, docket no. 27 at E–5 through E–6. The parties were unable to settle an order to effect the ruling, however, they eventually resolved their disputes through a settlement that this court approved on March 26, 1997. Pursuant to that settlement, among other things, the debtor received about $278.000.00. The September 1994 agreement is discussed further in section II.B. of this Opinion.

In January 1997, Pepper filed an application that requested final approval of $59,-594.00 in compensation and $6,313.05 for the time period May 1, 1996 through November 22, 1996 (the seventh application period), and final approval of all previously approved fees and expenses. Docket no. 173, Jackson responded by Filing an objection to the application for the seventh period and a cross-motion for disgorgement of all fees and costs previously approved and paid to Pepper. Hamilton, and Scheetz. Docket no.

194. F & D did not join in the objection or cross-motion. While the objection raised several theories,. it was agreed between counsel and the court that only issues relating to Jackson's assertions that Pepper was not a disinterested person, had failed to disclose a disqualifying conflict of interest, and that disgorgement and denial of all fees and expenses was appropriate, would be litigated before this court at this time.[1] *See generally* docket no. 338, ¶ 1. Post-hearing briefing on this matter was completed on September 22, 1997.

In the T. Frederick Jackson Chapter 11 case, no trustee has been appointed, and the debtor has been operating its business with all the rights, functions and duties of a trustee, 11 U.S.C. § 1107(a). In January 1996, this court consolidated the Jackson case with the Olsen Industries case for the purposes of administration only. The two debtors have filed an amended plan, and a confirmation hearing on that plan was held on September 5, 1997. The plan contemplates that the present disgorgement motion will provide funding for distributions under the plan. The record on confirmation was left open and this court reserved decision on confirmation pending a decision on the disgorgement motion. A motion to dismiss or convert is also pending.

Further findings of facts are discussed below.

## II. *Discussion of the Disinterestedness and Disclosure Issues*

As an overview of the issues raised by the disgorgement motion, the United States Bankruptcy Code requires that, in order to be employed, a law firm that represents a debtor must "not hold or represent an interest adverse to the estate, and [be a] disinterested person[ ], to represent or assist the [debtor] in carrying out the [debtor's] duties under this title." 11 U.S.C. § 327(a).[2] Furthermore, a law firm must disclose all connections and facts relevant to a determina-

---

1. The other issues raised in the objection and cross-motion ·related to alleged malpractice of the Pepper law firm the alleged administrative insolvency of the debtor, and alleged violations of the applicable Local Order on fee applications.

2. A "person" includes an individual, a partnership, and a corporation. 11 U.S.C. § 101(41).·

tion of whether a firm is disinterested under section 327(a). Fed.Rules Bankr.Proc.Rule 2014(a). Jackson argues that Pepper, Hamilton, and Scheetz did not disclose certain connections, and that those connections made the Pepper firm not disinterested. For these reasons, Jackson seeks disgorgement of all previously paid fees and expenses, and denial of Pepper, Hamilton, and Scheetz seventh application for fees and expenses. As it turns out, while the disgorgement motion implicates and requires discussion of section 327(a), only the issues concerning the disclosure requirement will be ruled upon.

On October 31, 1994, the debtor filed an application to employ Pepper, Hamilton, and Scheetz. Attached to that application was an affidavit signed by Francis J. Lawall, Esquire of the Pepper firm. Lawall stated therein:

> I have no interest (other than counsel) in T. Frederick Jackson ..., its creditors, or any other party known to me to be in interest ... except that Pepper, Hamilton, and Scheetz has, prior to [T. Frederick Jackson's] filing of the instant proceeding, represented Olsen Industries, which owns one hundred percent (100%) of [T. Frederick Jackson's] common stock, and further except that Fidelity and Deposit Company of Maryland ("F & D"), a secured creditor of the Debtor, has agreed to Fund [sic] Pepper, Hamilton, and Scheetz's legal fees and properly reimbursable out-of-pocket costs, and, further, except that prior to this bankruptcy case the Pepper Firm's legal fees and properly reimbursable out-of-pocket costs incurred in connection with the filing of this case and other litigation were advanced to the Pepper Firm by the Applicant and through F & D.

PHS Exhibit no. 41, Affidavit of Proposed Attorney, at ¶ 3.

A "disinterested person" is defined as a person that:

> (A) is not a creditor, an equity security holder, or an insider;
>
> * * *
>
> (E) does not have an interest materially adverse to the interest of the estate or of

any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

11 U.S.C. § 101(14).

Jackson asserts that subsection 101(14)(E) is not satisfied. It refers to the condition as stated in the October 15, 1993 letter from Kenneth M. Cushman. Esquire to Fred Olsen on behalf of T. Frederick Jackson:

> Pepper will not represent T. Frederick Jackson, ... in connection with any matter where T. Frederick Jackson, yourself or any indemnitor may be adverse to F & D."

Docket no. 338 ¶ 30. Jackson argues this condition was a term of Pepper's employment at all times during the Chapter 11 proceedings, and was not disclosed to the court and parties in interest.

A. *There was an Undisclosed Employment Restriction on Pepper's Representation of the Debtor.*

■ Pepper, Hamilton, and Scheetz appears to dispute that the above-quoted condition was a term of its employment during the Chapter 11 case. Mr. Lawall of the Pepper firm testified on the existence and scope of this restriction during the bankruptcy. His testimony was inconsistent. He initially testified that he was unaware of "any restrictions or conditions or limitations on the scope of Pepper's employment." Docket no. 346 at 99. He also didn't remember having seen the October 1993 letter at the time the employment application was drafted and filed. He was then confronted with the language of a later letter from Cushman to Olsen (January 18, 1995, Debtor's Exhibit 3). which provided that "the scope of [the firm's] engagement from the start of our relationship has been limited to the extent that we will not represent Jackson in connection with any matter where it may be adverse to F & D." Lawall stated that he didn't view the language as a "specific conditions," and that "I don't know whether I was actually aware of that specific limitation." *Id.* at 100.

Lawall was then confronted with his deposition testimony, which was read into the record:

> QUESTION: Was it your understanding at this time you determined to accept the engagement for the bankruptcy proceeding that that restriction existed?
>
> ANSWER: No. I believe—let me answer this way. It was consistent from the beginning ... Therefore, the position was that we were not going to take a litigation position against F & D out of the concern, if such position were taken, F & D would discontinue the funding and we would be in a position where we were funding this case on a contingent basis. And that was unacceptable to us as a firm.

*Id.* at 103–104.

Later during the evidentiary hearing, he revised his belief, stating: "The nature of our representation with respect to Jackson had changed." *Id.* at 108. Less than a page later in the transcript, Lawall stated that the relationship remained consistent from the filing of the bankruptcy throughout the course of the bankruptcy. *Id.* at 109.

The court finds Lawall's above testimony impossible to reconcile.

The Pepper firm has also argued that at times it took positions on behalf of the debtor that were adverse to F & D. This is irrelevant. That the firm may have been selective of its enforcement of an employment restriction does not vitiate the existence of the restriction. Abundantly clear from the record is that the Pepper firm was concerned at all the times with the spectre of F & D terminating the funding of the firm's fees. There was at all times during the representation by Pepper, Hamilton, and Scheetz of the debtor T. Frederick Jackson a self-imposed employment restriction—Pepper, Hamilton, and Scheetz would not represent T. Frederick Jackson in connection with any matter where it may be adverse to F & D.

Pepper, Hamilton, and Scheetz agrees it did not specifically disclose this restriction.

### B. *The Restriction Became Relevant to the Disinterestedness Standard During the Chapter 11 Case.*

This finding brings the court to the next part of the debtor's argument—that this restriction should have been disclosed. The debtor primarily relies upon the disclosure requirements of Bankruptcy Rule 2014(a). While the language of this Rule is quoted below for completeness, it is not necessary for the court to engage in a parsing of that language,[3] as Pepper, Hamilton, and Scheetz properly agrees that under this Rule and the applicable law, all of the facts relevant to a determination of whether an attorney is disinterested must be disclosed, and that the attorney has the affirmative duty to disclose potential conflicts. Docket no. 361 at 14; *accord Rome v. Braunstein,* 19 F.3d 54, 59 (1st Cir.1994). This standard is sufficiently detailed to address the disclosure issues in the case *sub judice.*

In the context of its disclosure argument, the debtor argues that the employment restriction is an "interest materially adverse to the interest of its estate" within the meaning of section 101(14)(E). As stated in the *Leslie Fay* case:

> The Code does not attempt to define what constitutes an adverse interest. However, interests are not considered "adverse"

---

3. Bankruptcy Rule 2014(a) states:

   (a) Application for and Order of Employment. An order approving the employment of attorneys ... pursuant to § 327 ... of the Code shall be made only on application of the [debtor]. The application shall be filed and, unless the case is a chapter 9 municipality case, a copy of the application shall be transmitted by the applicant to the United States trustee. Tile application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

merely because it is possible to conceive a set of circumstances under which they might clash. The more difficult area is when a live conflict of interest has not quite emerged, yet the factual scenario is sufficiently susceptible to that possibility so as to make the conflict more than merely 'hypothetical or theoretical.'

*In re Leslie Fay Companies,* 175 B.R. 525, 532 (Bankr.S.D.N.Y.1994) (citations omitted).

In attempting to provide the court with an analytical framework on the adverse interest issue. Pepper, Hamilton, and Scheetz refers to, among other decisions, *In re BH & P,* 949 F.2d 1300 (3d Cir.1991). That case addressed whether the trustee and his professionals possessed "an actual conflict of interest" under section 327(c) of Title 11, and should be disqualified. After examining case law from other jurisdictions, the *BH & P* court held that the bankruptcy court must decide, under the specific facts of the employment arrangement, whether the arrangement "carries with it a sufficient threat of material adversity to warrant [disqualification.]" *Id.* at 1312 (quoting *In re Martin,* 817 F.2d 175, 181–83 (1st Cir.1987)).

As Pepper, Hamilton, and Scheetz recognizes, while the *BH & P* case addresses a different subsection of section 327, it is helpful in evaluating the standard of "an interest materially adverse to the interest of the estate" under section 101(14)(E).

The debtor has not explained in its briefing how it believes the court should apply the standard of section 101(14)(E) to the circumstances here, although implicit in some of its argument is that Pepper, Hamilton, and Scheetz violated applicable professional codes of conduct. Indeed, courts sometimes rely upon the applicable state rules of professional conduct as guidance for determining whether a conflict of interest exists in a law firm's representation of a party to a bankruptcy case. *In re Star Broadcasting, Inc.,* 81 B.R. 835, 839 (Bankr.D.N.J.1988) (citing cases).

The debtor has pointed to Rule 1.7(b) of the Pennsylvania Rules of Professional Conduct and the Delaware Rules of Professional Conduct. That Rule is materially the same in both jurisdictions, and states:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after full disclosure and consultation.

*E.g.,* Delaware Rules of Professional Conduct Rule 1.7(b).

Pepper has argued that the issue of whether it violated Rule 1.7 was not fairly raised by the pleadings. This argument is without merit. *E.g.,* Docket no. 338, at 24, ¶ 5 (section of pre-trial order citing and discussing language of Rule 1.7(b)). The standard of Rule 1.7(b) will be considered for the purposes of the disinterestedness issues and the disclosure issues.

Allen B. Dubroff, Esquire, testified for the debtor on the Rule 1 .7 issue. Dubroff, who practiced law for about 20 years for predecessors of the very same Flamm firm that is prosecuting this disgorgement motion, opined that the restriction should have been disclosed at the time of Pepper. Hamilton, and Scheetz' initial application. On cross-examination, however. Dubroff admitted that if there was an agreement of Jackson not to sue F & D, then the restriction was not a material limitation. Docket no. 346 at 145.

Pepper took the position that the restriction did not have to be disclosed and presented the testimony of Thomas Ambro, Esquire. However, Ambro never directly addressed the issue of whether disclosure was necessary given the precise facts present here. Moreover, his articulated standard, that "you need to give an experienced judge the information that that judge needs to make a determination as to whether the firm should be retained," docket no. 346 at 242, is one with which this court cannot agree. This standard suggests different standards depending on the "experience" of the judge, and personalizes the section 327(a) analysis by forcing the court to conclude it is inexpe-

rienced before holding that disclosure is necessary. This standard also ignores that fact that parties in interest are entitled to proper disclosure.

■ Having considered the opposing testimony directed towards the issues of whether the employment restriction was an interest materially adverse to the interest of the estate, or should have been disclosed, the court is not much closer to resolution of either of these issues. As recognized by the parties, these issues are intertwined, yet not identical. The court will determine only whether or when the employment restriction should have been disclosed. The disinterestedness issue will he discussed further to the extent necessary to resolve that disclosure issue.

■ As a starting point for the court's analysis, the mere fact that a large creditor of the estate provided funding for the fees of debtor's counsel, in the debtor's own words, "is acceptable, and often routine." Docket no. 365 at 5. This funding arrangement was almost by necessity here, where the debtor had no substantial assets other than unliquidated claims against Morse Diesel. Furthermore, the court does not believe that an employment restriction of the type here creates a *per se* violation of section 327(a). As Lawall recognized, the restriction was "an inherent limitation" that existed from the beginning of the case, docket no. 346 at 104, and the nature of this limitation "changed, depending upon the nature of the relationship [between the debtor and F & D] with respect to the Morse Diesel litigation." *Id.* at 104.

Thus, in order to evaluate whether or when the employment restriction should have been disclosed, this court must take a closer look at the facts of the relationships and interests of the parties during the Chapter 11 case. As discussed below, the relationships and interests changed significantly during the Chapter 11 case.

Shortly before the Chapter 11 filing, the parties entered into the agreement of September 6, 1994. This agreement in turn modified and incorporated an October 11, 1993 agreement. In paragraph 11 of the 1994 agreement, Jackson released F & D from all claims relating to, among other things, any matter arising out of the issuance of the bonds, the prior agreements between the parties, and the litigation of the Morse Diesel action. All parties viewed this agreement as the final resolution of the ongoing negotiations between Jackson and F & D. Because of the releases. Jackson specifically recognized that pursuant to the agreement, it had no claims against F & D. Docket no. 346 at 64, 73, 90.

However, after Jackson filed its Chapter 11 petition, as a matter of bankruptcy law, the legal status of the pre-petition 1994 and 1993 agreements changed. These agreements became "executory contracts" within the meaning of 11 U.S.C. § 365. An executory contract needs to be assumed pursuant to section 365 for it to be fully binding on the debtor.

Nonetheless, despite the theoretical uncertainty concerning the binding nature of the pre-petition contracts, both Olsen as principal of the debtor, and the Pepper firm contemplated that these agreements and related agreements would be assumed.[4] This contemplation existed from the first day of the debtor's Chapter 11 case, Indeed, on that first day, Jackson filed a motion for preliminary approval of a financing agreement with F & D which stated in part:

> [T]o secure permanent financing from F & D, the movant shall file . . . a motion to assume executory contracts. . . . If assumed, these executory contracts will provide the movant with post-petition financing on a going forward basis.

Case no. 94–1041, docket no. 3, ¶ 10; *see also* Docket no. 346 at 120–121 ("at the outset of the relationship, the debtor had intended to assume the executory contracts").

As long as these agreements were to be assumed, the debtor had no claims against F & D. F & D also believed its interests were aligned with those of Jackson at the inception of the bankruptcy case. Docket no. 346 at 184. Therefore, as long as these agreements were to be assumed, there was no possibility

---

4. The other related agreements (ten) are set forth at docket no. 165, paragraph 2.

of adversity of interests between Jackson and F & D.

For these reasons, the court finds that at the inception of the debtor's Chapter 11 case, the employment restriction had no application to the circumstances that existed at that time, did not implicate Rule 1.7(b), and was not relevant to the standard of section 101(14)(E). Pepper, Hamilton, and Scheetz was not required to disclose the employment restriction at that time.

■ These circumstances remained the same for several months, however, eventually they changed. As Lawall acknowledged: "After a period of time, Mr. Olsen had determined on behalf of the estate that he was not prepared to assume the contracts." Docket no. 346 at 120–121.

More specifically, the decision to assume remained consistent through the month of February 1995. Docket no. 346 at 124. Thereafter, the financing for the debtor was derived from a stand-alone agreement. *Id.* at 122. The question of whether the contracts would be assumed became subsumed in the plan negotiation process, and the provisions addressed in the executory contracts became open issues. *Id.* at 126.

At least one of these open issues gave rise to an adversity of interest between Jackson and F & D subsequent to March 1, 1995. Specifically, one of the provisions of the September 6, 1994 agreement had addressed how the proceeds of a favorable judgment in favor of Jackson and against Morse Diesel would be divided between Jackson and F & D. *See generally* PHS Exhibit 34, ¶ 6, at 5–6. Without this provision, there was an issue as to how F & D would be reimbursed for its post-petition financing. F & D had a lien on the proceeds of the Morse Diesel litigation and took the position that reimbursement of its post-petition financing should come off the top of the Morse Diesel proceeds. Jackson took the position that F & D's post-petition financing should come out of the latter's share. This issue pitted the pecuniary interests of F & D against those of the debtor, and even the Pepper firm recognized that

once the financing for the debtor was provided by a stand-alone agreement, that this issue would be a point of contention between the debtor and F & D. Docket no. 346 at 121–22. The record further reflects that this issue remained open throughout the duration of Pepper's representation of the debtor.

Thus, at this chronological juncture, March 1, 1995, the possibility that the debtor would take a position adverse to the interests of F & D with respect to the division of the Morse Diesel proceeds changed from merely conceptual to actual. If thereafter, Jackson instructed the Pepper firm to take a position adverse to that of F & D, that instruction would conflict with the employment restriction.[5] Thus, at this juncture, the restriction on Pepper, Hamilton, and Scheetz' employment implicated Rule 1.7(b), and represented a fact relevant to the standard of section 101(14)(E). At this juncture, Rule 2014 required the Pepper firm to disclose the employment restriction.

The debtor has suggested that other disputes between it and F & D that arose subsequent to March 1, 1995 also established that the restriction became relevant to disinterestedness standard. Because of the court's ruling immediately above, these other issues need not be addressed.

■ Thus, at the time Pepper, Hamilton, and Scheetz filed its 2014 statement, there was no disclosure violation. However, a professional employed under 11 U.S.C. § 327(a) is under a continuing obligation to supplement its 2014 statement if circumstances change. *In re McNar, Inc.*, 116 B.R. 746, 753 (Bankr.S.D.Cal.1990), *aff'd in part, remanded in part* 133 B.R. 561 (table), 1991 WL 199659 (9th Cir. BAP Sept. 30, 1991); *see In re Perrysburg Marketplace Co.*, 176 B.R. 797, 799 (Bankr.N.D.Ohio 1994). Circumstances did change on March 1, 1995, and disclosure of the employment restriction was required at that time. Pepper, Hamilton, and Scheetz did not supplement its Rule 2014 statement with the court. The court further finds that the firm's failure to disclose was intentional, and not through inadvertence.

---

**5.** As previously discussed, precisely how the Pepper firm acted subsequent to receiving such an instruction is not relevant to the Rule 2014 analysis. Section II.A., *supra,* at 56–57.

■ Pepper, Hamilton, and Scheetz argued twice during the evidentiary hearing that the relevant pleadings in the disgorgement motion alleged only a failure to disclose the employment restriction at the time of the initial employment application. Docket no. 347 at 266–270, 295–96. Regardless of the scope of those pleadings, the court does not believe that once the question of disinterestedness has been raised, that the court should turn a blind eye to a subsequent disclosure violation that appears from the evidence. The bankruptcy court has an independent duty to review all fee applications in the absence of any objection, *In re Busy Beaver*, 19 F.3d 833, 840–45 (3d Cir.1994), and can raise the issue of disgorgement of fees for failure to disclose even in the absence of an objection. *In re Mills*, 170 B.R. 404, 408 (Bankr.D.Ariz.1994). *See also In re Scoggins*, 142 B.R. 940, 942–43 (Bankr.D.Or.1992) (court disgorged portion of previously approved fees of trustee's attorney in the absence of objection); *In re Dixon*, 143 B.R. 671, 673 (Bankr.N.D.Tex.1992) (*sua sponte* disgorgement of fees); Fed.R.Bankr.P. 2017(b).

The Pepper firm received adequate notice of the subsequent disclosure issue. The pleadings raised the disclosure issue. In its response to the objection and cross-motion, Pepper, Hamilton, and Scheetz itself raised the issue of whether it was disinterested "throughout Pepper's representation of T. Frederick Jackson ... in this chapter 11 case." Docket no. 206, ¶ 2. *See also id.* at 6–7. Similarly, at the evidentiary hearing, Pepper, Hamilton, and Scheetz itself submitted numerous exhibits created in time well after its employment application was approved. During the evidentiary hearing the debtor specifically raised the issue of subsequent disclosure, and moved to conform its pleadings to the evidence.[6] A subsequent disclosure violation results in a pecuniary sanction no larger than the total disgorgement sanction that the debtor seeks in its pleadings. Under these circumstances, there was no surprise, and it is fair and appropriate to consider the subsequent disclosure violation

as a basis for the debtor's motion for denial and disgorgement of fees.

Pepper, Hamilton, and Scheetz similarly argued that the issue of disclosure under Rule 2014 was not properly raised, and that the court should not consider it. This argument is also without merit. In addition to the above reasons, the court notes that Pepper's own witness, Thomas Ambro, specifically opined on the issue of the sufficiency of disclosure under the requirements of Rule 2014.

The debtor has raised alternative bases for its disgorgement motion. It argues that the Pepper firm did not comply with the disclosure requirements of Bankruptcy Rule 2016. This argument adds nothing to the above analysis of the issues and will not be separately addressed.

■ Finally, that the Pepper firm should have disclosed the employment restriction as of March 1, 1995 does not necessarily mean that the employment restriction constitutes a "material interest adverse to the interest of the estate" under section 101(14)(E). A court may find a disclosure violation without holding that it would have found the law firm not disinterested given timely and complete disclosure. *E.g., Jensen v. United States Trustee (In re Smitty's Truck Stop)*, 210 B.R. 844, 850–51 (10th Cir. BAP 1997); *see also In re Saturley*, 131 B.R. 509, 516–517 (Bankr.D.Me.1991); *In re Kero–Sun, Inc.*, 58 B.R. 770, 778–79 (Bankr.D.Conn.1986) (citing *In re WPMK*, 42 B.R. 157, 163 (Bankr.D.Hawai'i 1984)). Having found an intentional and serious disclosure violation, this court does not deem it necessary to rule on the disinterestedness issue.

III. *What Remedy is Appropriate Under the Circumstances of This Case?*

So far, the court has determined that as of March 1, 1995, the Pepper firm failed to disclose to the court and parties in interest facts relating to its non-disinterested status. The remaining question is: What is the appropriate remedy in favor of the debtor?

---

6. The court was never asked to rule upon that motion. As explained in the text of this Opinion, it is granted.

The debtor asks that this court direct the disgorgement of all fees and expenses previously paid to the Pepper firm, and deny the pending application for fees and expenses.

During the debtor's bankruptcy case, the court has considered six interim tee applications of Pepper, Hamilton, and Scheetz. In total, these six applications have been approved in an amount of $1,173,821.15 in fees, and $124,313.62 in expenses, a total of $1,298,134.77.[7] Sadly, the debtor's briefing does not inform the court of the amounts it believes were paid to Pepper, Hamilton, and Scheetz, even though these dollar amounts are fundamental to its disgorgement request. The closest the debtor's briefing comes to pinpointing this amount is an off-hand reference to the total award of fees and expenses to Pepper, Hamilton, and Scheetz being "in excess of $1,300,000.00." Docket no. 362 at 27. On the basis of the previous court orders on the interim fee applications, the court will infer that the total amount paid to Pepper, Hamilton, and Scheetz is $1,298,134.77.

Also pending is the application of the Pepper firm for the time period May 1, 1996 through November 22, 1996, which requests final approval of $59,594.00 in compensation and $6,313.05 in reimbursement of expenses.

The court's discussion of the appropriate remedy will divide the objection and cross-motion into three fee application periods, and in the following order: The time period May 1, 1996 through November 22, 1996; the time period October 31, 1994 through February 29, 1995; and the time period March 1, 1995 through April 30, 1996.

A. *The Pending Application for Time Period May 1, 1996 Through November 22, 1996 Will be Denied.*

▇▇▇ With respect to the pending application for the time period May 1, 1996 through November 22, 1996, T. Frederick Jackson believes it should be denied in full. This application seeks an order approving the stated fees and expenses in full, and directing the debtor to pay the approved amounts.

Docket no. 173. The court stated at the conclusion of the evidentiary hearing that it would consider this application at a later time. Docket no. 347 at 438. That statement, however, was addressed to the situation where Pepper, Hamilton, and Scheetz prevailed upon the disclosure issues for the period May 1, 1996 through November 22, 1996. This court has found that Pepper, Hamilton, and Scheetz violated the disclosure requirements of Rule 2014 prior to this application period. The debtor has cited many cases for the proposition that a disclosure violation warrants denial of a pending fee application. *E.g., In re Hot Tin Roof Inc.*, 205 B.R. 1000, 1003–04 (1st Cir. BAP 1997). The court sees no reason to deviate from the rulings in those cases with respect to the pending application of the Pepper firm. That application is denied.

B. *The Disgorgement Motion as to the Application for the Time Period October 31, 1994 Through February 29, 1995 Will be Denied.*

▇▇▇ As for the amounts previously paid to Pepper, Hamilton, and Scheetz, the debtor believes the appropriate remedy is for the Pepper firm to "disgorge" all fees and costs previously approved and paid to the Pepper firm. This would result in a payment of $1,298,134.77 from the Pepper firm to the debtor. For the time period prior to March 1, 1995, however, the debtor's basis for disgorgement has not been shown, and no disgorgement is appropriate. *In re Watson Seafood & Poultry*, 40 B.R. 436, 440–43 (Bankr.E.D.N.C.1984). The costs reimbursed prior to that date, $28,515.58, are finally approved.

The debtor has alternatively objected to court approval of the fees billed prior to March 1, 1995 on the basis that the time entries include inappropriate billing for travel time. The debtor has not identified any specific entries within this time period that allegedly include such travel time. The debtor shall file a document identifying all such

---

7. The dollar figure for the fees is $2,000.00 less than the sum of the approved fees as asserted in Pepper, Hamilton, and Scheetz' seventh fee application. Docket no 173. For the period January 1, 1995 through February 28, 1995, this court approved the amount of $203,133.50, not $205,133.50 in fees as was asserted in the fee application.

entries. Pepper, Hamilton, and Scheetz shall file a responsive document. The court will then determine an appropriate procedure to resolve any disputed entries. The fees billed prior to March 1, 1995, $336,549.25, are finally approved, subject to any reductions for travel time.

### C. The Disgorgement Motion as to the Fees and Expenses Paid for the Time Period March 1, 1995 Through April 30, 1996 is Granted Only to the Extent Equitable.

The last category of fees and expenses subject to the debtor's objection and cross-motion are the fees and expenses billed and paid for the time period March 1, 1995 through April 30, 1996. This amount is $933,069.94. Pepper, Hamilton, and Scheetz failed to disclose information within the scope of Bankruptcy Rule 2014(a) during this period. Again, the debtor has cited many cases for the proposition that a disclosure violation warrants disgorgement of all previously paid fees and expenses. E.g., In re Hot Tin Roof Inc., 205 B.R. 1000, 1004 (1st Cir. BAP 1997). The debtor relies upon these decisions, and asserts that Pepper, Hamilton, and Scheetz should disgorge the paid fees and expenses. The Pepper firm disagrees, asserting that for reasons discussed later in this section of the Opinion, it would be inequitable to require the firm to pay the debtor $933,069.94.

The court cannot agree with the debtor's apparent assertion that this court should automatically disgorge all fees and expenses without regard to equitable circumstances that may exist here. The court's power to disgorge fees and expenses of a professional should be exercised with restraint and discretion. E.g., In re Downs, 103 F.3d 472, 478 (6th Cir.1996). In exercising that discretion, this court should apply principles of equity, as other courts have done.

For example, in In re Watson Seafood & Poultry, 40 B.R. 436, 440–43 (Bankr. E.D.N.C.1984), the debtor company filed a Chapter 11 petition in April 1983. On October 14, 1983, a trustee was appointed. After that date, debtor's counsel represented third parties in connection with the purchase of assets from the debtor's estate. The third parties were also stockholders or creditors of the estate. The court properly held that an actual conflict existed in connection with those purchases, however, the court noted that debtor's counsel did not represent any adverse interest prior to the trustee's appointment. The court concluded that to balance "the need for sanctions and the inequity which would result from a denial of all fees, . . . an appropriate sanction is the denial of all compensation after October 14, 1983." Id. at 443.

In In re Kendavis Indus. Intern., 91 B.R. 742, 748–57 (Bankr.N.D.Tex.1988), the Official Unsecured Creditors' Committees moved to disgorge over $4 million in compensation previously awarded to the law firm representing the debtor entities. The Kendavis court found, partly on the basis of newly submitted evidence, that the law firm represented adverse interests and was "not disinterested" for the entire term of its representation of the debtors. However, in determining an appropriate sanction, the court recognized that "an adequate balance [should be] struck between the attorney discipline and the exceptional equities of this case." Id. at 762. In particular, previous court orders had, on an interim basis, overruled objections based upon conflict of interest. The court was also troubled by the delay of over two and one-half years in the filing of the disgorgement motion. The court disallowed only 50% of the compensation previously paid to the law firm. Id. at 745–47, 762. See also In re McNar, Inc., 116 B.R. 746, 753 (Bankr.S.D.Cal.1990), aff'd in part, remanded in part 133 B.R. 561 (table), 1991 WL 199659 (9th Cir. BAP Sept. 30, 1991) (partial reduction of fees as sanction for non-disclosure of conflict of interest).

As a starting point, the court is very troubled that Pepper, Hamilton, and Scheetz failed to disclose the employment restriction, and finds that the sanction of disgorgement at some level is appropriate. Pepper, Hamilton, and Scheetz asserts there are equitable circumstances which warrant less than full disgorgement of fees and expenses previously paid for the time period March 1, 1995 through April 30, 1996. The most important

circumstance relied upon by Pepper, Hamilton, and Scheetz is the source of the fees and expenses that have been paid on an interim basis to the Pepper firm, and the effect of disgorgement in the debtor's case, as opposed to a more typical case.

In a typical case, the debtor pays fees to the professional from its own assets. If a professional is subsequently found to have committed a disclosure violation for the period during which it was paid fees, disgorgement has the effect of requiring that professional to *return* the paid fees to the debtor.

However, where the source of the fees are assets of a third party, and not the debtor, the equities of the situation may be materially different, and complete disgorgement may not be appropriate. Pepper, Hamilton, and Scheetz asserts the source of the monies was F & D, and that ordering Pepper, Hamilton, and Scheetz to pay the debtor an amount equal to the previous payments it received for approved fees and expenses would result in a windfall to the debtor and would be inequitable.

In response, the debtor has stated only that: "F & D loaned money to the Debtor: the Debtor then paid Pepper's fees; and the Debtor then paid F & D in full for all loans for which disgorgement is sought." Docket no. 365 at 6. The response is without citation to the factual record and in part contravenes that record.[8]

More importantly, the debtor's response misses the mark of Pepper, Hamilton, and Scheetz' equity argument. During the course of the bankruptcy case, the source of the funds for the payment of the firm's fees and expenses was F & D, not Jackson. Under the terms of the September 1994 settlement, F & D's super-priority lien was first paid off in full, and the remainder was split between F & D and the debtor in an 85/15 proportion. Docket no. 338 at ¶ 42. After the Morse Diesel litigation concluded, and after the debtor assumed paragraph 6 of the 1994 settlement, F & D recovered those pay-

ments off the top of the proceeds. In the context of the debtor's disgorgement request, the Pepper firm asks this court to consider the true cost to the estate of the debtor of amounts paid to the Pepper firm during the period March 1, 1995 through April 30, 1996.

If the court had reduced by one dollar the approved compensation of the Pepper firm during this time period, then F & D would have recovered one dollar less off the top of the Morse Diesel proceeds. This would create one more dollar available for distribution pursuant to the 85/15 term of the September 1994 settlement. Of that one additional available dollar, the debtor would be entitled to fifteen cents. Thus, for every dollar paid to the Pepper firm from March 1, 1995 through April 30, 1996, a disgorgement sanction should only entitle the debtor to fifteen cents.

From March 1, 1995 through April 30, 1996, the amount of fees paid to the firm was $837,271.90, and the amount of expenses reimbursed was $95,798.04, for a total of $933,069.94. Therefore, if these amounts were disallowed in full, the additional amount to which the debtor would be entitled is $139,960.49.[9]

Another and related equitable circumstance is that F & D has not joined in the objection or the disgorgement motion of the debtor. It is now too late for F & D to do so, yet the debtor is attempting to assert F & D's rights to a portion of the proceeds. Finally, the debtor's disgorgement motion attempts to avoid the effect the September 1994 agreement which the debtor assumed. Assumption allows the debtor to receive the benefits of an agreement, but also binds the debtor to the obligations of that agreement. *In re Sharon Steel Corp. v. National Fuel Gas Distrib.*, 872 F.2d 36, 40 (3d Cir.1989). Considering all these circumstances, the court agrees with Pepper, Hamilton, and Scheetz that to give the debtor the other 85% of the $933,069.94 amount ($793,109.45)

---

8. The briefs in support of the debtor are replete with unsupported factual assertions, reference to exhibits that were never admitted, incorrect legal citations, and other violations of applicable rules. This practice continued despite this court's no-

tice that such non-compliance would not be tolerated. Docket no. 356.

9. Fifteen per cent of $933,069.94 is $139,960.49.

would result in a windfall and would be inequitable.

■ Thus, the court finds that Pepper, Hamilton, and Scheetz should disgorge to the debtor only that amount which the debtor would actually receive under the terms of the 1994 agreement. Only $139,960.49 of the fees and expenses previously paid to Pepper, Hamilton, and Scheetz will be disgorged. That, in conjunction with publication of this Opinion, will suffice as a sanction for the disclosure violation.

It is important to note that the court is not adopting all the equity arguments of the Pepper firm. The firm argues that the disclosure violation arose (if at all) in the context of its representation of the debtor in the Chapter 11 proceedings, and not the Morse Diesel litigation. The firm concludes that in addition to the fifteen percent factor, only fees corresponding to the firm's bankruptcy activities should be considered subject to disgorgement. This argument is without merit.

■ Finally, the court deems it neither necessary nor appropriate to address Pepper, Hamilton, and Scheetz' other equity argument—that the fees should not be disgorged in light of the benefit to the estate obtained by the firm and as allegedly exemplified by the Morse Diesel judgment. The benefit issues have not been litigated before this court, and may be the subject of a separate action. Moreover, the sanctions determined by this Opinion are appropriate regardless of the alleged benefit Pepper, Hamilton, and Scheetz provided to the estate. *E.g., In re Kero–Sun, Inc.,* 58 B.R. 770, 777, 778–79 (Bankr.D.Conn.1986) (disgorgement of fees paid to disqualified debtor's attorney appropriate for disclosure violation regardless of benefit to the estate).

IV. *Conclusion*

An order in accordance with this Opinion is attached.