### In re GRANITE PARTNERS, L.P., Granite Corporation, and Quartz Hedge Fund, Debtors.

Bankruptcy Nos. 94 B 41683(SMB) to 94 B 41685(SMB).

United States Bankruptcy Court, S.D. New York.

March 9, 1998.

serves the dischargeability of alimony debts if they are "assigned" by the non-debtor spouse to another entity.

Harrison J. Goldin, Chapter 11 Trustee, Goldin Associates, L.L.C., New York City.

Willkie, Farr & Gallagher (Myron Trepper, Benito Romano, John R. Oller, of counsel), New York City, for Chapter 11 Trustee.

Kramer, Levin, Naftalis & Frankel (Kenneth H. Eckstein, of counsel), New York City, for Harrison J. Goldin.

Grais & Phillips, L.L.P. (Isaac Corre, of counsel), New York City, for Gifford Fong Associates.

Berlack, Israels & Liberman, L.L.P. (Steven E. Greenbaum, Edward S. Weisfelner, of counsel), New York City, for Unofficial Investors' Committee.

Friedman, Kaplan & Seiler, L.L.P. (Eric Seiler, of counsel), New York City, for Litigation Advisory Board.

Carolyn Schwartz, U.S. Trustee (Diana G. Adams, Asst. U.S. Trustee, of counsel), New York City.

Zalkin, Rodin & Goodman, L.L.P. (William H. Schrag, Jay Teitelbaum, of counsel), New York City, for Richard S. Toder, Fee Examiner.

## MEMORANDUM DECISION REGARDING APPLICATIONS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

STUART M. BERNSTEIN, Bankruptcy Judge.

The principal matter before the Court calls into question the disinterestedness of a chapter 11 trustee's counsel who must investigate potential claims against another client. This and other conflict, disclosure and contract issues have been raised in connection with the final applications for compensation and reimbursement of expenses filed by the chapter 11 trustee, Harrison J. Goldin, his counsel, Willkie, Farr & Gallagher ("Willkie Farr"), and one of his consultants, Gifford Fong Associates ("Fong"). The objections bring to the fore charges of concealment, conflict and breach of duty by the trustee and these professionals.

These questions are always troubling, and their resolution rarely satisfies everyone involved. These cases will probably be no exception. Based upon a consideration of the issues raised, and as described in greater detail below, the Court allows Willkie Farr's fees and expenses in the aggregate amount of $2,203,521.67, allows the trustee's commissions in the amount of $1,061,507.00, and allows the Fong application, in full, in the aggregate amount of $404,710.62.

### BACKGROUND

**A. The Chapter 11 Cases**

Except as noted, the facts are not in dispute, and are based upon the report submitted by Richard S. Toder, Esq., the Court-appointed examiner. *(See Report of Richard S. Toder, Fee Examiner, Concerning Final Fee Applications of Harrison J. Goldin,*

*Willkie, Farr & Gallagher and Gifford Fong Associates,* dated October 6, 1997 ("*Fee Examiner's Report* ").) Prior to bankruptcy, the debtors invested funds raised from outside investors in collateralized mortgage obligations ("CMOs") created and sold by several broker-dealers, including Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"). In early 1994, interest rates rose and the value of the debtors' CMO investments dropped. The broker-dealers made margin calls, the debtors could not meet the margin calls, and the broker-dealers then liquidated the collateral that the debtors had pledged. This led to the collapse of the debtors' businesses and the filing of these chapter 11 cases on April 7, 1994.

In response to a motion by the Official Committee of Unsecured Creditors, the Court appointed Harrison J. Goldin, Esq., as chapter 11 trustee. In addition to the general duties of a chapter 11 trustee, his charge was to investigate and report on the events leading to the debtors' collapse and to identify possible estate claims against the broker-dealers, the debtors' insiders, and the professionals that the debtors employed. This last group included the debtors' auditor, Price Waterhouse & Co. ("Price Waterhouse").

## B. The Retention of Willkie Farr

The trustee needed competent and experienced counsel to assist him. His selection criteria emphasized the firm's experience and reputation, freedom from actual or potential conflicts of interest, and willingness to pursue claims against any target. (*See Fee Examiner's Report,* Ex. "C".) The trustee provided each candidate with a written scope of the investigation, and identified potential litigation targets, including Price Waterhouse and Merrill Lynch. (*See id.* at 8–10.) In addition, the trustee provided each candidate with a list of the twenty largest creditors

which also included Merrill Lynch and Price Waterhouse. (*Id.* at 10.)[1]

The trustee canvassed the views of the other parties in interest, and narrowed the field to five firms, including Willkie Farr. Following a series of interviews, the trustee selected Willkie Farr, and no one has ever questioned its qualifications. In the course of these interviews, however, Willkie Farr revealed the following pertinent information to the trustee (*see id.* at 11–12):

1. It had represented some of the broker-dealers in the past on unrelated transactions, but did not currently represent any of them;

2. It was in the process of admitting Richard D. Rudder, Esq., as a partner in the area of structured finance. Rudder's clients at his former firm, Brown & Wood, included Merrill Lynch (as well as other broker-dealers);

3. It would not sue Price Waterhouse for two reasons: Price Waterhouse was Willkie Farr's own auditor, and additionally, the firm represented the American Institute of Certified Public Accountants ("AICPA"); and

4. It would represent the estate in any litigation against financial institutions or broker-dealers, but as a precaution, it would obtain waivers of conflicts from all former broker-dealer clients.

The trustee was prepared to overlook Willkie Farr's refusal to prosecute potential claims against Price Waterhouse, because once it obtained waivers, it was willing to sue the broker-dealers. (*Affidavit of Harrison J. Goldin, Trustee, Respecting Applications of Willkie Farr & Gallagher and Gifford Fong Associates for Final Allowance of Compensation,* sworn to May 6, 1997 ("*Goldin Affidavit* "), at ¶ 13.)[2] Further, the trustee believed that any potential claims against the debtors' auditor would involve different facts and law. Hence, he felt that

---

1. The debtors' schedules, filed May 16, 1994, do not list Merrill Lynch as a creditor. Instead, they list Merrill Lynch as an account debtor, owing the three debtors the aggregate amount of $1,986,582.00. Merrill Lynch never filed a proof of claim in any of the cases. Accordingly, Merrill Lynch was not a creditor in any of the three cases.

2. The trustee disqualified another candidate because that law firm currently represented several broker-dealers involved in the bankruptcy cases and needed conflict waivers, and because it would not sue Price Waterhouse. (*See Fee Examiner's Report* at 11.)

Willkie Farr could conduct the investigation, and special counsel could be retained to prosecute any claims. (*Id.*)

The trustee moved to retain Willkie Farr by application and notice of proposed order dated June 17, 1994. The application annexed the affidavit of Myron Trepper, Esq., a member of Willkie Farr, (*"Trepper Affidavit"*), and relevant portions are reproduced in the margin.[3] Trepper stated that Willkie Farr had represented parties in interest in the past on unrelated transactions and might represent them in the future on unrelated transactions. In addition, Willkie Farr had "client relationships" with various (unidentified) creditors and broker-dealers, but the

affidavit did not disclose what this meant. Trepper concluded that Willkie Farr was disinterested, and did not represent an adverse interest.

On July 22, 1994, the Court signed the retention order, *nunc pro tunc* to June 14, 1994.

## C. Willkie Farr's Connections with Merrill Lynch

At the time that the trustee applied to retain Willkie Farr, and Trepper submitted his disclosure affidavit, Willkie Farr failed to disclose that it currently represented Merrill Lynch in the following five open matters:

| CLIENT/MATTER NO. | DATE OPENED | DATE CLOSED | FEES COLLECTED | |
|---|---|---|---|---|
| 57397/304 | 07/06/93 | — | All Prior To June 14, 1994 | |
| 57397/3902 | 07/06/93 | — | All Prior To June 14, 1994 | |
| 57396/301 | 10/20/93 | 02/01/95 | Jan. 1995 | ($212,853.50) |
| 57394/801 | 01/24/94 | — | 1994 | ($15,269.00) |
| | | | 1995 | ($12,085.00) |
| | | | 1996 | ($31,567.50) |
| 57396/302 | 05/23/94 | 08/12/94 | 1995 | ($281,371.09) |

(*Supplemental Response of Willkie Farr & Gallagher to Objections to Final Fee Application,* dated December 8, 1997 (*"Willkie Farr Supplemental Response"*), Ex. "A".) Willkie Farr contends that these matters, though technically open, were not currently active. (*Willkie Farr Supplemental Response* at ¶ 2 n. 1.) In fact, it appears that the first two transactions were completed. The

other three, however, generated substantial fees well into 1995, and even 1996.

After Rudder joined the firm on June 19, 1994, the pace of its Merrill Lynch representation dramatically increased. During the next two and one-half years, Willkie Farr opened approximately 400 Merrill Lynch matters. Willkie Farr describes the majority of these matters as commercial loan closings

3. The *Trepper Affidavit* states in part:

2. Neither I, said law firm, nor any member or associate thereof, insofar as I have been able to ascertain, has any connection with the debtors herein (collectively, the "Debtors"), their creditors, or any other party in interest herein, or their respective attorneys, except that I, WF & G, its members and associates have (a) appeared in the past and may appear in the future in cases where one or more of said parties may be involved; and (b) represented in the past and may represent in the future one or more of said parties, in matters unrelated to these chapter 11 cases.

. . . .

5. WF & G has client relationships unrelated to the Debtors' cases with various creditors and other parties in interest in the Debtors' cases, including certain creditor/broker-dealers and members of the Creditors' Committee.

WF & G has not represented and will not represent any such parties in connection with the Debtors, their businesses or these chapter 11 cases. WF & G is unaware of, and has not been advised of, any actual or potential conflict arising from its engagement in these cases. However, in the interest of full disclosure, WF & G has advised its interested clients of WF & G's proposed engagement by the Trustee and has requested their acknowledgment and consent to such retention. Neither I, WF & G, nor any member or associate thereof, insofar as I have been able to ascertain, represents any interest adverse to Harrison J. Goldin, the trustee appointed herein in the matters upon which said law firm is to be engaged. Accordingly, I believe WF & G is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.

that opened and closed in weeks—sometimes days—and generated fees of between $10,000.00 to $20,000.00 per transaction. (*Id.* at ¶ 2.)[4] On June 28, 1994, while the retention application was *still pending* and less than two weeks after it admitted Rudder, Willkie Farr opened three new Merrill Lynch matters (57400/1, 57400/301, 57400/302) which generated $1,351,917.66 in legal fees in 1995 and $1,065,000.00 in 1996. The following chart reflects the sharp increase in legal fees that Willkie Farr received from Merrill Lynch in 1995 and 1996 during the same period that the firm also represented the trustee in his investigation of, among others, Merrill Lynch:

| YEAR | Fees Collected from Merrill Lynch | % of Total Willkie Farr Fee Income |
|---|---|---|
| 1993 | $ 293,907.16 | 0.18% |
| 1994 | 36,052.00 | 0.02% |
| 1995 | 3,079,412.43 | 1.75% |
| 1996 | 6,264,869.11 | 2.98% |
| **TOTAL** | 9,674,240.70 | 1.34% |

(*Willkie Farr Supplemental Response*, Ex. "A".)

Willkie Farr did not disclose its increasing representation of Merrill Lynch to the Court until after it filed its final fee application in April 1997.

**D. Merrill Lynch's Refusal to Return a Written Conflict Waiver**

In the retention application, Willkie Farr stated that it would seek waivers from its broker-dealer clients. By letter dated June 15, 1994, Willkie Farr advised its broker-dealer clients that it had been retained by the trustee to investigate the circumstances surrounding the collapse of the debtors' investments and their liquidation, to determine the existence of meritorious claims, and if appropriate, to pursue such claims against the responsible parties, including creditor/broker-dealers. (*See Fee Examiner's Report*, Ex. "G".) Willkie Farr asked each recipient to sign and return the waiver letter as evidence of its consent to Willkie Farr's representation of the trustee.

All recipients returned the signed waiver letter except Merrill Lynch. Apparently, Merrill Lynch did not sign written waivers as a matter of corporate policy. (*Fee Examiner's Report* at 14–16.) On July 21, 1994, Benito Romano, Esq., a partner at Willkie Farr, wrote to Thomas J. Mullaney, Esq. at Merrill Lynch, reminding him that the trustee had retained Willkie Farr to investigate the "circumstances which gave rise to the Chapter 11 Debtors' losses and the liquidation of the portfolios of the Chapter 11 Debtors." (*Id.*, Ex. "H".) The letter did not refer to the identification or prosecution of claims, but asked Merrill Lynch to sign and return the waiver letter if it had not already done so.

On July 28, 1994, Romano spoke to Mullaney who confirmed Merrill Lynch's corporate policy against signing consent letters. Mullaney nevertheless gave his oral consent. The parties agree that the oral waiver extended to the investigation, but the fee examiner contends that it went no farther. (*Id.* at 15.) Willkie Farr maintains that the waiver also applied to the prosecution of claims, *see Response of Willkie Farr & Gallagher to Objections to Final Fee Application*, dated Nov. 10, 1997 ("*Willkie Farr Response*") at ¶ 10, but at the argument of the fee objections Willkie Farr stated that it believed that

---

4. Nevertheless, Willkie Farr's fee chart shows a number of more significant Merrill Lynch matters that generated fees between $50,000 and $500,000 each. (*See Willkie Farr Supplemental Response*, Ex. "A".) Moreover, the chart ends with 1996. Since Merrill Lynch payments sometimes lagged behind the service for several months it is fair to assume that Willkie Farr received additional fees on at least some of these matters after the close of 1996.

the Merrill Lynch consent was insufficient to cover the prosecution of claims. (Transcript of hearing, held Nov. 24, 1997 ("Tr."), at 60.)

Willkie Farr did not disclose that Merrill Lynch had refused to return the signed waiver consenting to its representation of the trustee.

### E. The Retention of Fong

In early 1995, the trustee sought to retain Fong as a consultant to analyze the debtors' portfolios to determine, *inter alia,* their "market neutrality." (*See Application to Employ and Retain Gifford Fong Associates as Consultant for Harrison J. Goldin, Trustee for Above–Captioned Debtors,* dated February 28, 1995 ("*Fong Retention Application*") ¶¶ 8–9, at 4–5.) Fong was "uniquely qualified" to perform the task. It had expertise in portfolio analysis, had developed proprietary software needed to perform a "modeling analysis", and possessed the requisite "ability, willingness and independence." (*Id.* ¶¶ 9–12, at 5–6.)

Fong had its own connections with Merrill Lynch and some of the other broker-dealers. According to a disclosure affidavit signed by Mr. H. Gifford Fong, Fong "currently provides consulting services to an accounting firm retained by Merrill Lynch to analyze portfolios involved in a lawsuit unrelated to these cases in which Merrill Lynch is a defendant." (*Affidavit of H. Gifford Fong in Support of Application for Order to Employ and Retain Gifford Fong Associates as Consultant to Trustee for The Above–Captioned Debtors Pursuant to Bankruptcy Rule 2014(a),* sworn to February 15, 1995 ("*Fong Affidavit*"), at ¶ 2, 1–2.) In addition, Fong had cleared and executed trades for Bear Stearns, another broker-dealer. The application elicited some objections, and, *inter alia,* raised questions regarding Fong's connections with Merrill Lynch. In a supplemental affidavit, Mr. Fong stated that counsel to Merrill Lynch had retained an accounting firm who, in turn, had retained Fong. (*Sup-*

*plemental Affidavit of H. Gifford Fong in Support of Trustee's Application for Order Authorizing Retention of Gifford Fong Associates,* sworn to March 13, 1995 ("*Fong Supplemental Affidavit*") at ¶ 2.)

By Order dated March 27, 1995, the Court approved Fong's retention.

### F. The Events Leading to the Appointment of the Examiner

The trustee rendered his final report on April 18, 1996. ("*Trustee's Final Report*"). It identified, *inter alia,* $9.9 million in claims against Merrill Lynch arising from the commercially unreasonable liquidation of the debtors' securities, (*id.* at 207–09), and also identified claims in an unspecified amount arising from the wrongful liquidation of the securities. (*See id.* at 305.) The report also concluded that Price Waterhouse had not breached any duty to the debtors. (*Id.* at 351.) Two events connected with the trustee's final report became the catalyst for the appointment of the fee examiner.

#### 1. Fong's Refusal to Testify

In October, 1996, Mr. Fong advised David Pauker, a business associate of the trustee, that he would not provide expert testimony. (*Fee Examiner's Report* at 20.) In a letter dated October 21, 1996, Pauker memorialized the conversation, and attributed Fong's refusal to his connections with Merrill Lynch.[5] (*Id.,* Ex. "K".) Mr. Fong responded two days later. He did not answer Pauker's characterization of his reasons, and stated that Fong had fulfilled its contract. Fong offered to discuss a second retention with a new scope of responsibility. (*Id.,* Ex. "J".)

#### 2. Willkie Farr's Inability to Represent the Litigation Advisory Board ("LAB")

The second and more significant revelation involved Willkie Farr's conclusion that it

---

**5.** The trustee believed that Merrill Lynch had pressured Fong into refusing to testify. (*See Goldin Affidavit* ¶ 25.) The fee examiner investigated the allegation but did not find evidence to substantiate it. (*See Fee Examiner's Report* at 20.) Nevertheless, the Litigation Advisory Board

("LAB"), the successor to the trustee under the plan, has asserted this claim against Merrill Lynch in the action pending in the Southern District of New York before District Judge Robert Sweet. (*Id.* at 20–21 n. 13.)

could not represent the LAB, the trustee's successor. In the fall of 1996, the LAB approached Willkie Farr about prosecuting the claims against the broker-dealers identified in the *Trustee's Final Report*. (*Fee Examiner's Report* at 17.) Willkie Farr initially advised the LAB that it first had to obtain Merrill Lynch's waiver and consent. (*Id.*) Eventually, it declined the representation because Merrill Lynch refused to grant consent. (*Id.*)

The Court did not learn of this until Willkie Farr filed its final fee application in April 1997.[6] Anticipating an objection, Willkie Farr disclosed that Merrill Lynch had refused to give a conflict waiver, (*Willkie Farr Final Fee Application* at ¶ 53), and that the Unofficial Investors Committee ("UIC")[7] would argue that the trustee's investigation was tainted by Willkie Farr's relationship with Merrill Lynch. (*Id.* at ¶ 54.) Willkie Farr pointed out that (1) its original retention application disclosed that it had client relationships with the broker-dealers that were not related to these cases, (*id.* at ¶ 55), and (2) "Merrill Lynch was not a significant client" at the outset of the investigation. (*Id.* at ¶ 56.) Further, the trustee identified significant potential claims against Merrill Lynch only at the end of the investigation, and although Willkie Farr and Merrill Lynch discussed settlement preliminarily, Willkie Farr did not pursue further settlement discussions at the request of the UIC. (*Id.*)

The issue of Willkie Farr's conflict and Fong's refusal to testify came to a head in late April, 1997, when the various parties filed their final fee applications. The trustee sought $1,176,507.00 in commissions and $6,487.08 in expenses. Willkie Farr requested a final allowance of $4,666,970.92 in fees and $495,685.31 in expenses.[8] Fong sought final allowance of $403,721.00 in fees and

$989.62 in expenses.[9] The United States Trustee, the UIC and the LAB filed objections. In addition, the UIC sought the appointment of an independent fee examiner.

By Order dated June 10, 1997 (*Fee Examiner's Report*, Ex. "A"), the Court appointed Richard S. Toder, Esq., as fee examiner, to investigate certain specific claims lodged against Willkie Farr, the trustee and Fong, and to file a report within 120 days. The appointing order directed the fee examiner to investigate and report on Willkie Farr's relationship with the broker-dealers who were targets of the trustee's investigation, its initial and subsequent disclosures and the conflict waivers that it had requested. He was also directed to investigate and report on the scope of Fong's retention and the circumstances surrounding his alleged refusal to perform his duties, including his refusal to testify. Finally, the fee examiner was directed to ascertain whether the trustee had failed to inquire into the facts relating to the employment or continued employment of Willkie Farr or Fong or the fulfillment of their respective retention duties.

## G. The Fee Examiner's Report

### 1. Willkie Farr

The fee examiner filed a comprehensive report on October 7, 1997. He concluded that Willkie Farr had violated the disclosure requirements imposed under the Bankruptcy Code and Rules, characterizing the disclosure in the *Trepper Affidavit* as mere "boilerplate." (*Fee Examiner's Report* at 53–54.) Further, Willkie Farr's failure to provide proper initial or supplemental disclosure was "not inadvertent", and represented a "conscious decision to not specifically refer to known connections with potential litigation targets presumably because it did not think

---

6. (*See Application of Willkie Farr & Gallagher, as Attorneys for the Chapter 11 Trustee, for (A) Final Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred from June 14, 1994 through March 13, 1997, Inclusive, and (B) Order Increasing Maximum Compensation Relating to Investigative Services*, dated Apr. 21, 1997 ("*Willkie Farr Final Fee Application*").)

7. The UIC consisted of thirty eight shareholders and limited partners in the debtors. *In re Gran-*

*ite Partners, L.P.*, 213 B.R. 440, 450 (Bankr. S.D.N.Y.1997).

8. Willkie Farr had already received interim awards of $2,028,617.26 in fees and $343,098.91 in reimbursed expenses.

9. Fong had already received interim awards of $296,984.00 in fees and $370.74 in reimbursed expenses.

it necessary to do so." (*Id.* at 55.) The fee examiner concluded that Willkie Farr's "connections were anything but *de minimis* and should have been fully disclosed to the Court." *(Id.)* The fee examiner also criticized Willkie Farr's failure to disclose its inability to sue Price Waterhouse. (*See id.* at 55–56.)

Turning to the question of conflicts, the fee examiner concluded that, "given the practicalities of the cases and the discrete nature of the claims which may have been asserted against [Price Waterhouse], the connection would not necessarily have risen to the level of an adverse interest under Code § 327(a) thereby disabling [Willkie Farr] from serving as counsel to the Trustee." · (*Id.* at 56.) The retention of Willkie Farr to investigate claims against the broker-dealers, however, was "more problematical." (*Id.* at 57.) At the time of the retention, "[t]his Court could well have concluded that concerns over the integrity of an investigation conducted by counsel who had represented a target of the investigation, coupled with an inability to represent the estate in any ensuing litigation against that party, were sufficient to require different general counsel." (*Id.*) Moreover, whereas the Merrill Lynch representation may only have raised the appearance of impropriety initially, by 1995 or 1996 Willkie Farr's "representation of the Trustee in connection with known claims against a substantial existing client constituted a disabling conflict of interest under Code § 327(a)." (*Id.* at 58.) The fee examiner recommended "a partial, but significant disallowance" of the unpaid fees sought by Willkie Farr. (*Id.* at 59.)

### 2. The Trustee

The fee examiner concluded that the trustee should have disclosed what he knew about Willkie Farr's relationship with Merrill Lynch and the firm's refusal to sue Price Waterhouse. (*Id.* at 61.) He concluded, however, that the trustee did not have an obligation to make subsequent disclosure, as Willkie Farr did not inform him of the expanding Merrill Lynch representation or of Willkie Farr's failure to obtain a litigation waiver from Merrill Lynch. (*Id.*) The fee examiner recommended "a small reduction, if any at all" in the trustee's compensation. (*Id.* at 62.)

### 3. Fong

The fee examiner found that Fong had made full disclosure, and there was no basis to impose sanctions solely as a result of its connection to Merrill Lynch. (*Id.*) The fee examiner concluded, however, that Fong had breached its contract of retention by refusing to provide expert testimony. (*Id.*) He recommended the following sanctions: (1) a substantial reduction of unpaid fees, (2) requiring Fong to provide the LAB with all work product and supporting documentation in connection with his services, and (3) ordering Fong to reasonably cooperate with the LAB and its new counsel to minimize damages flowing from its breach. (*Id.* at 63.)

## DISCUSSION

### A. Disinterestedness under the Bankruptcy Code

Section 327(a) of the Bankruptcy Code authorizes a trustee to retain attorneys or other professionals subject to court approval. It provides as follows:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

The section imposes two express requirements. First, the professional must be a "disinterested person." Section 101(14)(E) of the Bankruptcy Code, the so called "catchall" provision, states in pertinent part that a "disinterested person" is one who "does not have an interest materially adverse to the interest of the estate . . . for any . . . reason." Second, the professional must not "hold or represent an interest adverse to the estate." 11 U.S.C. § 327(a). The two requirements apply at the time of retention and throughout the case. *Rome v. Braunstein,*

19 F.3d 54, 62 (1st Cir.1994); *In re Caldor, Inc.*, 193 B.R. 165, 171 (Bankr.S.D.N.Y.1996); *see* 11 U.S.C. § 328(c)(court may disallow fees if at anytime during the professional's employment, it is not disinterested or represents or holds an adverse interest with respect to the matter on which employed).

 Undefined by the Bankruptcy Code, an "adverse interest" has come to mean either (1) the possession or assertion of any economic interest that would tend to lessen the value of the bankruptcy estate or create an actual or potential dispute with the estate as a rival claimant, or (2) a predisposition of bias against the estate. *See, e.g., In re Crivello*, 134 F.3d 831, 835–36 (7th Cir. 1998); *In re CF Holding Corp.*, 164 B.R. 799, 806 (Bankr.D.Conn.1994); *In re Tinley Plaza Assocs.*, 142 B.R. 272, 277 (Bankr.N.D.Ill. 1992); *In re Roberts*, 46 B.R. 815, 827 (Bankr.D.Utah 1985), *rev'd in part on other grounds*, 75 B.R. 402 (D.Utah.1987); *see generally* William I. Kohn & Michael Shuster, *Deciphering Conflicts of Interest in Bankruptcy Representation*, 98 Com. L.J. 127, 142 (1993)("*Deciphering Conflicts* "). More generally, it includes any interest or relationship, however slight, "that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." *In re Roberts*, 46 B.R. at 828 n. 26; *accord In re BH & P, Inc.*, 949 F.2d 1300, 1309 (3d Cir.1991); *In re Black Hills Greyhound Racing Ass'n*, 154 B.R. 285, 292 (Bankr.D.S.D. 1993). The "materially adverse" standard incorporated in the disinterestedness test and the "interest adverse to the estate" language in section 327(a) overlap. *See, e.g., In re BH & P, Inc.*, 949 F.2d at 1314; *In re Martin*, 817 F.2d 175, 179 n. 4 (1st Cir.1987); *In re Leslie Fay Cos.*, 175 B.R. 525, 532 (Bankr.S.D.N.Y.1994); *In re CF Holding Corp.*, 164 B.R. at 806; *In re Tinley Plaza Assocs.*, 142 B.R. at 277. To this extent, the two prongs of section 327(a) are duplicative,

*In re Martin*, 817 F.2d at 179 n. 4, and form a single test to judge conflicts of interest.

Courts have identified two types of conflicts—actual and potential. An actual conflict involves the representation of "two presently competing and adverse interests," while a potential conflict occurs where the competition "may become active if certain contingencies arise." *In re American Printers & Lithographers, Inc.*, 148 B.R. 862, 866 (Bankr. N.D.Ill.1992). The distinction often seems artificial, and some courts have rejected it. *See In re Perry*, 194 B.R. 875, 879 (E.D.Cal. 1996). "Any potential conflict of interest represents a potential to overlook an asset or defense of the estate." *Deciphering Conflicts* 139. Nevertheless, the Bankruptcy Code perpetuates it in certain situations. *See* 11 U.S.C. § 327(c)(professional not disqualified solely because he represents a creditor unless an "actual" conflict exists).[10]

A more recent trend elides the distinction and focuses on the concerns of divided loyalties and affected judgments. Thus, the professional has a disabling conflict if it has "either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one." *In re Martin*, 817 F.2d at 180; *accord In re Leslie Fay Cos.*, 175 B.R. at 533. Disqualification is appropriate "if it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation." *In re Leslie Fay Cos.*, 175 B.R. at 533; *accord In re Crivello*, 134 F.3d 831, 835–36(a court should disqualify "any professional with an interest or relationship that would even faintly color the independence and impartial attitude required by the Code.")

 This approach is consistent with the New York Code of Professional Responsibility. Disciplinary Rule ("DR") 5–105(a) and (b)[11] forbid an attorney from commencing or

---

10. Section 327(c) is inapplicable to the present matter. The case concerns Willkie Farr's connections with Merrill Lynch and Price Waterhouse. Merrill Lynch was not a creditor of the estate and Willkie Farr did not represent Price Waterhouse.

11. DR 5–105 provides:

(a) A lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it

continuing simultaneous representation of two clients if his exercise of independent professional judgment on behalf of either would likely be "adversely affected," or where the dual representation would likely involve the representation of "differing interests." [12] Further, DR 5–105(d) forbids a lawyer from knowingly accepting or continuing a representation that any other lawyer in the firm could not. Although the client can, under certain circumstances, waive the conflict, DR 5–105(c), the mandatory provisions of section 327(a) do not allow for waiver. *See, e.g., In re Perry,* 194 B.R. at 880; *In re Envirodyne Indus., Inc.,* 150 B.R. 1008, 1016 (Bankr.N.D.Ill.1993); *In re Tinley Plaza Assocs.,* 142 B.R. at 278; *In re Diamond Mortgage Corp.,* 135 B.R. 78, 90 (Bankr.N.D.Ill. 1990); *In re Amdura Corp.,* 121 B.R. 862, 866 (Bankr.D.Colo.1990); *see generally* 3 Lawrence P. King, *et al. Collier on Bankruptcy* ¶ 328.05[3], at 328–32 (15th ed. rev.1997)("*Collier*"); Robin E. Phelan & John D. Penn, *Bankruptcy Ethics, An Oxymoron,* 5 Am. Bankr.Inst. L.Rev. 1, 27 (1997)("What may be ethically acceptable in commercial settings (*e.g.,* waivers upon informed consent) will not necessarily pass muster under section 327."). *But cf. In re Lee,* 94 B.R. 172, 179 (Bankr.C.D.Cal.1988)(under Rule 5–102 of the California Rules of Professional Conduct, attorney desiring to represent both a debtor in possession and a conflicting interest must obtain a written waiver from the debtor, all creditors and the United States trustee).

Finally, Canon 9 of the Code of Professional Responsibility states that "[a] lawyer should avoid even the appearance of professional impropriety." Generally, courts have refused to disqualify counsel based solely on Canon 9, relying instead on the more specific duty of confidentiality under Canon 4 or the interference with the lawyer's independent judgment under Canon 5. *Deciphering Conflicts* 130. In fact, it has been dropped by the Model Rules. *Deciphering Conflicts* 130. Section 327(a) nevertheless retains the "appearance of impropriety" standard. *In re Glenn Elec. Sales Corp.,* 99 B.R. 596, 601 (D.N.J.1988); *In re Nat'l Distribs. Warehouse Co.,* 148 B.R. 558, 561 (Bankr.E.D.Ark. 1992); *In re Codesco, Inc.,* 18 B.R. 997, 999 (Bankr.S.D.N.Y.1982); *Deciphering Conflicts* 131.

## B. Disclosure

■ The court and parties police conflicts through mandatory disclosure. Rule 2014(a) [13] of the Federal Bankruptcy Rules

---

would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5–105(c).

(b) A lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5–105(c).

(c) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each.

(d) While lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so under DR 5–105(A), (B) or (C), DR 5–108, or DR 9–101(B) except as otherwise provided therein.

N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.24 (1997). *Compare* Model Rules of Professional Conduct Rule 1.7 (1996)(lawyer shall not represent a client if such representation would be "directly adverse" to another client, unless (1) the lawyer reasonably believes it will not adversely affect the relationship with the other client, and (2) each client consents after consultation).

12. "Differing interests" include "every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest." N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.1(a) (1997).

13. Rule 2014(a) provides, in pertinent part, as follows:

... The application [for employment] shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, credi-

imposes disclosure requirements on trustees and the professionals they seek to retain. First, the trustee must file an application for an order approving the employment of attorneys or other professionals. The application must disclose, *inter alia,* "to the best of the applicant's knowledge, all of the [professional's] connections with the debtor, creditors, any other party in interest, [and] their respective attorneys and accountants." Second, the professional must submit a verified statement setting forth his connections with the debtor, creditors, or any other party in interest, as well as their respective attorneys and accountants. The scope of disclosure is much broader than the question of disqualification. *See In re Olsen Indus., Inc.,* 222 B.R. 49, 60 (Bankr.D.Del.1997)(court may find a disclosure violation even if the undisclosed connection does not amount to a conflict). The applicant and the professional must disclose all connections and not merely those that rise to the level of conflicts. *See In re Leslie Fay Cos.,* 175 B.R. at 536; *In re EWC, Inc.,* 138 B.R. 276, 281 (Bankr. W.D.Okla.1992).

Proper disclosure allows the court to decide, in an informed manner, whether the retention should be approved. *Rome v. Braunstein,* 19 F.3d at 59; *In re Leslie Fay Cos.,* 175 B.R. at 533. The professional must disclose all facts that bear on its disinterestedness, *In re Leslie Fay Cos.,* 175 B.R. at 533, and cannot usurp the court's function by choosing, *ipse dixit,* which connections impact disinterestedness and which do not. *In re Blinder, Robinson & Co.,* 131 B.R. 872, 883 (D.Colo.1991); *see Rome v. Braunstein,* 19 F.3d at 59 (noting that the "decision should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment"). The existence of an arguable conflict must be disclosed if only to be explained away. *Deciphering Conflicts* 143.

The professional's duty to disclose is self-policing. *In re Crivello,* 134 F.3d at 839. The court relies primarily on forthright disclosure; to determine qualification under section 327. *See Rome v. Braunstein,* 19 F.3d at 59. It should not have to "rummage through files or conduct independent factfinding investigations" to determine if the professional is disqualified. *In re Rusty Jones, Inc.,* 134 B.R. 321, 345 (Bankr.N.D.Ill. 1991); *accord In re Leslie Fay Cos.,* 175 B.R. at 533. Further, mere "boilerplate" disclosure may cover an inadvertent failure to disclose an insignificant connection, but does not suffice for known connections with parties presenting a significant risk of adversity. *See In re Leslie Fay Cos.,* 175 B.R. at 537 ("boilerplate" disclosure of representation of a known and significant creditor held insufficient).

Rule 2014(a) does not expressly require supplemental or continuing disclosure. *See In re Caldor, Inc.,* 193 B.R. at 176. Nevertheless, section 327(a) implies a duty of continuing disclosure, and requires professionals to reveal connections that arise after their retention. *See In re Olsen Indus., Inc.,* 222 B.R. at 59; *In re CF Holding Corp.,* 164 B.R. at 806; *In re Tinley Plaza Assocs.,* 142 B.R. at 278; *In re Diamond Mortgage Corp.,* 135 B.R. at 89; *In re EWC, Inc.,* 138 B.R. at 282; *In re McNar, Inc.,* 116 B.R. 746, 753 (Bankr.S.D.Cal.1990), *modified on other grounds,* 133 B.R. 561, 1991 WL 199658 (9th Cir. BAP 1991)(unpublished op.). "[T]he need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment." *Rome v. Braunstein,* 19 F.3d at 57–58; *accord In re Unitcast, Inc.,* 214 B.R. 979, 986 (Bankr.N.D.Ohio 1997). Continuing disclosure is necessary to preserve the integrity of the bankruptcy system by ensuring that the trustee's professionals remain conflict free.[14] *See In re EWC, Inc.,* 138 B.R. at 280–81.

tors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor,

creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

14. Under 11 U.S.C. § 328(c), and with exceptions that are not relevant, the court may deny compensation to a professional who, at any time

■ If boilerplate disclosure at the time of the retention application covers, at most, inadvertent omissions of insignificant connections, boilerplate disclosure of prospective connections is rarely satisfactory. A boilerplate statement that the professional may represent an unspecified creditor or party in interest in unrelated transactions in the future is insufficient disclosure of future connections. *See In re Envirodyne Indus., Inc.,* 150 B.R. at 1012–13 & scheds. A, B (professional "invited" to supplement a rule 2014 affidavit that merely stated the firm had represented, did represent, and likely would represent in the future, estate creditors in unrelated matters); *cf.* N.Y. Cty. Law. Ass'n Comm. on Professional Ethics, Formal Op. No. 724 (1998)("if the waiver is to be effective with respect to a future conflict, it must contemplate that particular conflict with sufficient clarity so that the client's consent can reasonably be viewed as having been fully informed when it was given")(quoting ABA Comm. on Ethics and Professional Responsibility, Formal Op. 372 (1993)(prospective waiver of conflict that does not describe potential opposing party or a class of potentially conflicting clients would not survive scrutiny)).

## ANALYSIS

### A. Willkie Farr

#### 1. Merrill Lynch

■ Judged against these standards, the Court has no difficulty concluding that Willkie Farr represented adverse interests, and had a meaningful incentive, or the perception of one, to act contrary to the interests of the estates. We are concerned with whether Willkie Farr's relationship with Merrill Lynch tainted the investigation. Merrill Lynch was a significant and valuable client of Willkie Farr. Its importance as a client grew steadily, accounting for $9 million in fees during 1995 and 1996. In light of its expanding relationship with Merrill Lynch, Willkie Farr's concurrent representation of the trustee and Merrill Lynch created the ap-

pearance that its independent judgment and impartiality might be compromised. *In re Leslie Fay Cos.,* 175 B.R. at 534 (counsel investigating a significant client "had a perceptible economic incentive not to pursue the possibility of claims … with the same vigor and intensity it might have otherwise applied"); *cf. Estate of Re v. Kornstein Veisz & Wexler,* 958 F.Supp. 907, 911, 926 (S.D.N.Y.1997)(denying summary judgment dismissing claim based on conflict of interest where defendant attorneys who represented plaintiff in earlier arbitration received between 2% and 3% of their business from law firm that was corporate counsel to the opposing party in the arbitration).

*In re Bohack Corp.,* 607 F.2d 258 (2d Cir.1979), illustrates the concern with Willkie Farr's investigation of Merrill Lynch. In *Bohack,* the bankruptcy court authorized the debtor to retain the professional (Shaw) as special counsel to investigate, and if appropriate prosecute, claims for damages caused to the debtor as a result of a tender offer by Gulf & Western Industries, Inc. for the stock of A & P. *Id.* at 260. Shaw was selected by the debtor's chairman (Knobel), a long time business associate and close personal friend. *Id.* at 260–61. As a result of the investigation, the debtor commenced a state court action against Gulf & Western and its directors, and several former officers and directors of the debtor, including Charles G. Bluhdorn, who was also a controlling shareholder of the debtor. *Id.* at 260 n. 1. The state court complaint charged that the defendants wrongfully manipulated the board, but the complaint did not name Knobel as a defendant. *See id.* at 261.

Subsequently, the bankruptcy court granted the defendants' motion for reconsideration, and revoked Shaw's authority to prosecute the state court action. The bankruptcy judge found it inconceivable that Bluhdorn could have manipulated the board without Knobel's knowledge. Wary of Shaw's close relationship with Knobel and the failure to name Knobel as a defendant, the bankruptcy court directed the creditors' committee to

during his employment, does not satisfy the disinterestedness and adverse interest criteria set

forth in section 327(a).

recommend replacement counsel. *Id.* at 261. On appeal, the district court reversed, setting the stage for the proceedings before the Court of Appeals.

The Second Circuit framed the issue as whether Shaw was the proper counsel to conduct the investigation. *Id.* at 262. Echoing the concerns of the bankruptcy court regarding Shaw's close business and personal relationship to Knobel and the nature of the charges—that the defendants had manipulated the debtor's board—the Court was "fully persuaded" that Shaw was not the appropriate investigator. *Id.* at 262–63. Shaw responded, however, that he had determined that Knobel was innocent of any wrongdoing, and hence, should not be made a defendant. To the Court, this missed the point:

> Shaw nevertheless takes the position that in his professional judgment Knobel is not a proper party defendant and was innocent of any wrongdoing. That again may well be. The point, however, is that such a determination must be made by the counsel who is in a position to make an independent judgment. As the foregoing summary of Shaw's entanglement with Bohack and Knobel amply demonstrates, Shaw is obviously in no such position. The best interests of the debtor will undoubtedly be jeopardized unless impartial counsel makes the determination whether Knobel's involvement in the Machiavellian plot alleged in the complaint was innocent or sinister.

*Id.* at 263; *accord In re Marvel Entertainment Group, Inc.*, No. Civ. A. 97–638, 1998 U.S. Dist. LEXIS 1308, at *22 (D.Del. Jan. 27, 1998); *In re Neuman*, 138 B.R. 683, 687 (S.D.N.Y.1992); *See Electro–Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince)*, 40 F.3d 356, 360 (11th Cir.1994)(representation of chapter 11 debtor and his spouse, who received a potentially fraudulent transfer on the eve of bankruptcy, "deprived [the debtor] of a conflict-free, impartial, independent eval-

uation of the potential claims of and against his estate"); *In re Leslie Fay Cos.*, 175 B.R. at 535 ("An unbiased investigation of the facts is no less crucial than an unbiased evaluation of the law in assessing potential claims").

█ Consistent with *Bohack* and section 327(a), a lawyer cannot represent a trustee for the purpose of investigating the alleged wrongdoing of another, valuable client.[15] *E.g., In re Ginco, Inc.*, 105 B.R. 620, 621 (D.Colo.1988)(trustee cannot retain lawyer who also represents corporate principal where principal may have equity interest in debtor and is a potential target of mismanagement claims); *In re Leslie Fay Cos.*, 175 B.R. at 534; *In re F & C Int'l, Inc.*, 159 B.R. 220, 222 (Bankr.S.D.Ohio 1993)(debtor cannot retain special counsel who also represents outside directors to prosecute securities fraud case where defendants may assert claims—and the debtor may assert cross-claims—against the debtor's officers and directors); *see Rome v. Braunstein*, 19 F.3d at 60 (attorney's concurrent representation of a corporate chapter 11 debtor and its sole shareholder in an involuntary chapter 7 proceeding "plainly undermined confidence in [the attorney's] ability to provide impartial advice to the [chapter 11 debtor's estate] relating to prospects for recovering the alleged prepetition transfers to [the shareholder and his family]"). The lawyer owes a duty of loyalty to each client, and concurrent representation, even in unrelated matters, poses the danger of divided loyalties and affected judgments. *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976)(the propriety of concurrent representation of two different clients "must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients."); *see IBM Corp. v. Levin*, 579 F.2d 271, 280 (3d Cir.1978)(same); *see generally Deciphering Conflicts* 136.

**15.** This is not intended to mean that the lawyer can investigate or sue insubstantial, current clients; the lawyer would still owe a duty of loyalty to both. Conversely, section 327(a) does not necessarily prevent a lawyer from investigating or suing a former client that it had represented in unrelated matters. *See In re Amdura Corp.*, 121 B.R. at 871; *but cf. In re Marvel Entertain-ment Group, Inc.*, 1998 U.S. Dist. LEXIS 1308, at *24–25 (trustee cannot retain counsel to assess unrelated litigation against bank client even though counsel proposed to terminate its relationship with the bank). The circumstances before the Court do not present either of these situations.

This does not mean that Willkie Farr failed to discharge its investigative duties properly or breached its fiduciary duties to the estate. In this regard, the trustee's report identified substantial estate claims against Merrill Lynch. · But, like Caesar's wife, trustee's counsel must be above suspicion. Bankruptcy is concerned as much with appearances as with reality. *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966)("The conduct of bankruptcy proceedings not only should be right but must seem right")(Friendly, J.). No matter how thoroughly or fairly Willkie Farr conducted the investigation, the question will always linger whether it held back, or failed to bite the hand that feeds it quite as hard as the circumstances warranted. *See Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941).

Further, the taint extends to the results of the investigation into the conduct of the other broker-dealers. Merrill Lynch and the other broker-dealers are charged with similar wrongdoing. In fact, Willkie Farr eventually concluded that it could not prosecute the LAB claims against the other broker-dealers because Merrill Lynch allegedly participated in the conspiracy with them. (*See* Tr. 58.) Consequently, Willkie Farr could not identify claims against other broker-dealers without implicating Merrill Lynch.

Willkie Farr's conflicts are exacerbated by its failure to disclose its relationship with Merrill Lynch. The *Trepper Affidavit*, submitted at the time of the original retention application, consisted of boilerplate. It "disclosed" that Willkie Farr may have represented parties in interest in the past and may again in the future in matters unrelated to the estate. (*Trepper Affidavit* ¶ 2.) The *Trepper Affidavit* also disclosed that Willkie Farr had "client relationships" unrelated to

the debtors' cases with various creditors and other parties in interest, including creditor/broker-dealers.[16] (*Id.* at ¶ 5.) It did not mention Merrill Lynch by name.

The clear import of the *Trepper Affidavit* is that Willkie Farr did not currently represent any parties in interest or broker-dealers, and hence, that Willkie Farr did not have an existing client relationship with Merrill Lynch.[17] This was not true. Willkie Farr had five open matters involving Merrill Lynch, and thereafter performed legal services of substantial value on three of these matters. This suggests that Willkie Farr contemplated or should have contemplated future legal work on existing matters—even if they were then inactive—and should have disclosed this specifically to the Court. Further, Willkie Farr took on more Merrill Lynch business, even while the retention application was still pending, and never disclosed this information to the Court.

Finally, Willkie Farr should have disclosed that Merrill Lynch refused to return the written waiver. This does not mean that any waiver, oral or written, would be effective. Nevertheless, the circumstances put into question the extent to which Willkie Farr could investigate and prosecute claims against Merrill Lynch. Willkie Farr sensed the problem because it eventually sought another waiver from Merrill Lynch in late 1996 or 1997, but Merrill Lynch refused to give it. Willkie Farr should have been as concerned in July 1994 with the scope of the Merrill Lynch waiver as it was subsequently when it sought a new one. It knew that one of the selection criterion concerned the ability to prosecute claims, and questions regarding the scope of the Merrill Lynch waiver significantly affected its ability to litigate those claims.[18]

16. The reference to "creditor/broker-dealers" excludes Merrill Lynch which was not a creditor. Presumably, Willkie Farr did not intend this meaning.

17. Willkie Farr's submissions on this point continue to be confusing and confused. In its fee application, it stated that Merrill Lynch was not a "significant client" at the outset of the trustee's investigation. (*Willkie Farr Final Fee Application* at ¶ 56). Subsequently, however, Willkie Farr stated that Merrill Lynch was not an exist-

ing client at the time of the retention application. (*Willkie Farr Response* at ¶¶ 4–5.)

18. Willkie Farr arguably should have disclosed that Rudder would be admitted and that Willkie Farr anticipated an increase in Merrill Lynch business. First, Willkie Farr thought it important enough to mention to the trustee during the selection process. Second, the desire for Merrill Lynch's business—even if Willkie Farr never got any—might create the perception that it would not investigate Merrill Lynch diligently. Third,

With regard to the subsequent disclosure, Willkie Farr argues that it believed its initial disclosure covered unrelated matters and that until *Leslie Fay* clarified the law, its disclosure of prospective connections was "state of the art." This is consistent with the fee examiner's determination that the failure to disclose was not inadvertent, and Willkie Farr apparently concluded that further disclosure was not necessary. (*Fee Examiner's Report* at 55.) In other words, the nondisclosure was wilful but not evil. The facts of this case suggest, however, that Willkie Farr reached this conclusion because it feared the adverse consequences of full disclosure.

First, as a matter of professional ethics, Willkie Farr's disclosure of prospective conflicts was insufficient to support a finding that the trustee knowingly consented to the subsequent representation of Merrill Lynch. *See* N.Y. Cty. Law. Ass'n Comm. on Professional Ethics, Formal Op. No. 724 (1998)(discussed *supra*); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 372 (1993)(same). Willkie Farr's argument might have some force if its subsequent services were consistent with its prior services—isolated, unrelated transactions. The post-retention representation of Merrill Lynch, however, differed markedly from this description. In the year preceding its retention by the trustee, Willkie Farr received approximately $225,000.00 in fees from Merrill Lynch. Most of these fees pertained to a single matter (57397/304) that, though technically still open as of June 14, 1994, was apparently completed. Willkie Farr did not receive any additional fees on this matter. However, starting in late June 1994, Willkie Farr opened approximately 400 separate Merrill Lynch matters during the next two and one half years, and collected over $9 million in fees.

Second, if *Leslie Fay* opened Willkie Farr's eyes, they must have been shut before then. *Leslie Fay* was an important case, but Judge Brozman did not write on a *tabula rasa*. The Court concluded that boilerplate disclosure might cover "inadvertent failures to disclose insignificant connections" but was "not an adequate substitute for disclosure of representation of known and significant creditors." 175 B.R. at 537. This is in accord with *In re Envirodyne Indus., Inc.*, 150 B.R. 1008 (Bankr.N.D.Ill.1993). There, Salomon Bros. was a significant client of Cleary, Gottlieb, Steen & Hamilton, the debtors' proposed attorneys. Salomon was also a 64% owner of the debtors and a potential target of an investigation into an earlier leveraged buy out of the debtor. The court called Cleary's similar boilerplate disclosure, *see id.* at 1022 (Sched.A), a "disregard of [the attorney's] disclosure obligation under F.R. Bankr.P.2014(a)." *Id.* at 1021. A court should view the professional's claim of confusion about disclosure skeptically, *see In re Crivello*, 134 F.3d 831, 838–39, and such skepticism is warranted here.

Third, even if the Court credited Willkie Farr's reason for concluding that its initial disclosure was adequate, it does not get Willkie far. *Leslie Fay* was decided on December 16, 1994, only five months into these cases. Willkie Farr did not thereafter amplify its prior disclosures. Further, only a few months later, it prepared supplemental disclosure papers for Fong which described in detail Fong's relationship with Merrill Lynch. This should have alerted Willkie Farr to its own lack of disclosure. In addition, Willkie Farr's time records reveal several entries in October and November 1996 relating to Merrill Lynch, including a conference on October 8, 1996 involving the Willkie Farr bankruptcy lawyers, Rudder, the trustee's representative and others "re disp." No

the United States Trustee and the creditors and investors could have monitored any change in the nature, scope and significance of the representation. On the other hand, generally requiring disclosure of a law firm's business plans or expectations may prove unworkable. Firms are always seeking new clients and additional business from existing ones. A logical extension of the duty to disclose the Rudder situation might require a proposed professional to identify any

parties in interest whom it intended (or hoped) to pitch for business.

For the purposes of this case, it is sufficient to draw the line at the fact (rather than the prospect) of Merrill Lynch business. Thus, the Court need not decide that the professional must disclose even a reasonably anticipated increase in business because here, Willkie Farr clearly failed to disclose the Merrill Lynch business after it got it.

reason could exist for communicating with Rudder about these cases unless the matter concerned the conflict caused by Willkie Farr's representation of Merrill Lynch.

Most curious of all Willkie Farr sought (and the trustee gave) a waiver in March 1997, to enable Willkie Farr to represent Bear Stearns, another target broker-dealer, as managing underwriter in an unrelated public bond offering. It is difficult to understand why Willkie Farr sought a waiver from Bear Stearns and the trustee for this isolated transaction, but failed to follow the same course for any of the 400 Merrill Lynch matters that it opened. While it relies on its initial disclosure to cover the subsequent Merrill Lynch matters, it apparently concluded that the identical boilerplate did not cover the single Bear Stearns transaction. The failure to disclose the Merrill Lynch representation even after *Leslie Fay*, coupled with the disclosure to the trustee of the one Bear Stearns matter, impugns the honesty of Willkie Farr's professed belief that its initial disclosure was sufficient.

### 2. Price Waterhouse

Although Willkie Farr did not represent Price Waterhouse, its business association with Price Waterhouse and its representation of the AICPA also raised perception problems and should have been disclosed. Price Waterhouse was a target of the trustee's investigation. Willkie Farr advised the trustee, during the selection process, that it would investigate but not sue Price Waterhouse because it represented the AICPA. It suggested that if claims were identified, the trustee could hire special counsel. This predisposition raised the same independent judgment and loyalty issues that would exist if Price Waterhouse had been a Willkie Farr client. One might question Willkie Farr's willingness to suggest novel or untested theories of accountants' liability that would adversely impact on the members of the AIC-PA.

▮ In this regard, the portion of the trustee's final report dealing with Price Waterhouse covers only four pages, discusses

two auditing issues and concludes that no claims exist (*Trustee's Final Report* 351–54.) This may be a correct conclusion, particularly because the period of the investigation covered a relatively short time and may have fallen between audits. Nevertheless, the preconceived refusal to sue a potential defendant at the beginning of an investigation constitutes a disqualifying adverse interest. *See, e.g., In re Leslie Fay Cos.*, 175 B.R. at 535 (refusal to sue debtor's accountants and auditors); *In re Envirodyne Indus., Inc.*, 150 B.R. at 1014 n. 7 (refusal to investigate or represent debtors in a lawsuit arising out of a leveraged buy out); *cf. In re Amdura Corp.*, 121 B.R. at 871 (unwillingness to sue bank-client). In addition, although Willkie Farr advised the trustee that it would not sue Price Waterhouse, Willkie Farr did not advise the Court or the other parties in interest.[19]

### B. Sanctions against Willkie Farr

#### 1. Introduction

▮ The United States Trustee, the UIC and the LAB contend that the Court should deny the fee application and direct Willkie Farr to disgorge all interim fees and expenses. At a minimum, the Court should disallow a substantial portion. In this regard, the failure to make proper disclosure may itself warrant disqualification and partial or complete denial of compensation. *In re Diamond Mortgage Corp.*, 135 B.R. at 98; *see In re Roger J. Au & Son, Inc.*, 71 B.R. 238, 242 (Bankr.N.D.Ohio 1986); *In re Guy Apple Masonry Contractor, Inc.*, 45 B.R. 160, 168 (Bankr.D.Ariz.1984); *see also In re Futuronics Corp.*, 655 F.2d 463, 471 (2d Cir.1981)(decided under the former Bankruptcy Act)(abuse of discretion to award any fees to a professional who intentionally failed to disclose an illicit fee sharing arrangement to the court); *cf. In re Crivello*, 134 F.3d at 839 (court should punish a wilful failure to disclose connections required by Federal Bankruptcy Rule 2014(a) as severely as a fraud on the court)(*dicta*). Attorneys who seek appointment owe a duty of full disclo-

---

**19.** Willkie Farr attributes this to inadvertent oversight. Its inadvertence does not cure the

violation, but at most, bears on the appropriate sanction.

sure. "If that duty is neglected, however innocently, surely they should stand no better than if it had been performed." *In re Arlan's Dep't Stores, Inc.*, 615 F.2d 925, 933 (2d Cir.1979)(decided under the former Bankruptcy Act)(quoting *In re Rogers–Pyatt Shellac Co.*, 51 F.2d 988, 992 (2d Cir.1931)).

■ At a minimum, failure to disclose is an exacerbating factor warranting the reduction or denial of fees for lack of disinterestedness. *See Rome v. Braunstein*, 19 F.3d at 62 (clear failure of disclosure supports strictest sanction under section 328(c)); *In re Roberts*, 46 B.R. at 850 (failure to disclose, coupled with repeated violations of conflict of interest rules, supports complete denial of compensation). Regardless of the precise application, wilful or intentional failure to disclose merits the harshest sanctions. *See, e.g., In re Crivello*, 134 F.3d 831, 838–39.

The court's authority to reduce or deny fees based upon a lack of disinterestedness derives from 11 U.S.C. § 328(c) which provides, with exceptions that are not relevant, as follows:

> ... [T]he court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

■ Section 328(c) authorizes but does not necessarily mandate the denial of all fees; it is permissive in nature and committed to the discretion of the Court. *In re Kendavis Indus. Int'l, Inc.*, 91 B.R. 742, 762 (Bankr. N.D.Tex.1988); *In re Prince*, 40 F.3d at 360; *Gray v. English*, 30 F.3d 1319, 1323–24 (10th Cir.1994); *but see In re Federated Dep't Stores, Inc.*, 44 F.3d 1310, 1320 (6th Cir. 1995)(a professional who fails to meet the requirements of section 327 at the outset is not entitled to any compensation). The imposition of a sanction under section 328(c) serves three purposes. It punishes the

transgressor, *see* H.R. Rep. 95–595, at 329 (1977), S. Rep. 95–989, at 39 (1978)(section 328(c) provides a penalty for conflicts), deters future violations of section 327, *see In re Ochoa*, 74 B.R. 191, 197 (Bankr.N.D.N.Y. 1987); *In re Roberts*, 46 B.R. at 847, and preserves public confidence in the integrity of the bankruptcy process. *See In re Leslie Fay Cos.*, 175 B.R. at 538.

■ On the other hand, the bankruptcy court must not lose sight that it is a court of equity. Before imposing a sanction, the court may consider the value of services performed and the degree of harm or prejudice to the estate from the conflicted representation or employment. *See In re Leslie Fay Cos.*, 175 B.R. at 538 (considering the competence of services performed as well as the harm to the estate). The complete denial of fees in the absence of actual injury might be "draconian and inherently unfair". *In re GHR Energy Corp.*, 60 B.R. 52, 68 (Bankr. S.D.Tex.1985); *see generally* 3 Collier ¶ 328.05[4], at 328–34; *but see In re Unitcast, Inc.*, 214 B.R. at 988 (harm to the estate is irrelevant).

■ Further, a conflict does not necessarily taint every aspect of the representation. Where the professional has performed some service of unquestioned value, total denial of fees might result in an inequitable windfall to the estate. *See In re Kendavis Indus. Int'l, Inc.*, 91 B.R. at 762 (deducting 50% of the fee where conflicted counsel "plainly committed a great deal of time and labor to [the] cases," and complete denial of fees would be inequitable); *In Re Diamond Mortgage Corp.*, 135 B.R. at 98 (reducing fee by 60% in light of services beneficial to the estate); *In re Rusty Jones, Inc.*, 134 B.R. at 347 (disallowing 60% of the fee, otherwise allowable under § 330, where conflict existed but counsel expended considerable energy and confirmed the plan and performed valuable services pursuing estate claims and representing the debtor in a variety of other matters); *In re Roger J. Au & Son, Inc.*, 71 B.R. at 243 (despite disclosure violations, finding that substantial effort expended by counsel permitted deviation from flat denial of fees); *cf. Gray v. English*, 30 F.3d at

1324 ("We cannot say that Congress intended the bankruptcy court to deny compensation to other attorneys who served the estate without actual knowledge of their fellow attorney's wrongdoing.")

 Weighing the good with the bad necessarily abjures a bright line approach. *See Rome v. Braunstein*, 19 F.3d at 62. Nevertheless, many courts require the professional who has violated the rules governing disclosure or conflicts to show that the equities of the case warrant a deviation from the flat denial of all fees. *See, e.g., In re Vann*, 136 B.R. 863, 870 (D.Colo.1992), *aff'd*, 986 F.2d 1431 (10th Cir.1993); *In re Western Office Partners, Ltd.*, 105 B.R. 631, 636 (Bankr. D.Colo.1989); *In re Kendavis Indus. Int'l, Inc.*, 91 B.R. at 762; *In re Watson Seafood & Poultry Co., Inc.*, 40 B.R. 436, 440 (Bankr. E.D.N.C.1984); *see Gray v. English*, 30 F.3d at 1324 ("In exercising the discretion granted by the statute we think the court should lean strongly toward denial of fees....") This approach may provide a convenient starting point, but does not resolve the amount or severity of the sanction which, in light of the above findings, must be imposed. The Court must consider sanction issues on a case-by-case basis, and reach an equitable result in accordance with the circumstances that are presented to it.

 From the outset of this case, Willkie Farr's legal services and fees have been divided between its investigative and non-investigative work. It seeks total fees of $4,666,970.92; of that sum, $2,093,700.45, pertains directly to the investigation, and $2,573,270.47 pertains directly to the non-investigative/bankruptcy services, roughly a 45%/55% split. It is appropriate to consider the sanctions along the same two tracks.

## 2. Investigative Services

The Court concludes that Willkie Farr is not entitled to the $2,093,700.45 in fees for investigative services, based upon the totality of conflicts and disclosure failures pertaining to Merrill Lynch, Price Waterhouse and the AICPA. Although there is no evidence that Willkie Farr failed to discharge its duties in a thoroughly professional manner, such proof need not be offered. The estate and the other objectors are not required to prove that Willkie Farr's conflicts skewed the investigation or its results for at least two reasons. First, parties in interest, particularly clients, should not be forced to prove that a conflicted lawyer exercised his professional judgment partially and contrary to the estate's interests. Second, the estate could prove this only by redoing the investigation. *See, e.g., In re Leslie Fay Cos.*, 175 B.R. at 531.[20] It would have to bear the very same expenses that it seeks to save by objecting to the fees incurred by conflicted counsel.

Moreover, the investigation and final report are tainted. This taint prejudices the estates and compromises the integrity of the bankruptcy system. A trustee hiring an attorney to conduct an investigation with an eye toward identifying estate claims has the right to expect that the attorney will give him undivided loyalty and conduct an impartial investigation. The case law discussed *supra* makes clear that perception problems prevent the attorney from properly conducting an investigation into the potential wrongdoing involving important clients, close business associates or personal friends. Here, the public will always reasonably question whether Willkie Farr did something or failed to do something because of its connections with Merrill Lynch, Price Waterhouse and the AICPA.

The conflicts relating to the investigation are exacerbated by the disclosure problems which also pertain primarily to the investigation. For example, even if the Court credited Willkie Farr with the benefit of the doubt, and concluded that it did not actively represent Merrill Lynch at the very moment that it filed the retention application, this does not excuse its failure to disclose its subsequent

**20.** Unlike the *Leslie Fay* case, the Court specifically directed the fee examiner not to review the investigation results. The investigation was costly, and there was no evidence that the conflict affected the investigation which is, in any event, a moot point. Moreover, the LAB is in the best position to conduct a new investigation if it deems it necessary. The LAB is prosecuting claims against the broker-dealers, and can conduct its factual inquiry as part of the pre-trial discovery in those civil actions.

representation in 400 new matters and its receipt of approximately $9 million in fees, primarily during 1995 and 1996. Willkie Farr had no reasonable basis to believe that its boilerplate disclosure covered these new matters. While Willkie Farr suggests a good faith confusion regarding disclosure requirements, the Court questions the honesty of this contention for the reasons already stated.

Further, no equitable considerations or mitigating factors require an upward modification of the fee for investigative services. Indeed, the estates may suffer further costs. For instance, the LAB may conclude that it must redo all or part of the investigation. In addition, the LAB has been forced to hire new counsel and pay the new attorneys to come up to speed. Concededly, no one could have forced Willkie Farr to work for the LAB, and these are costs that the estates might have been compelled to bear even in the absence of a conflict. Nevertheless, the record shows that Willkie Farr declined to represent the LAB because Merrill Lynch would not grant a waiver, and not because Willkie Farr did not want to represent the LAB. Under the circumstances, the sanction of denial of all investigative fees is necessary to punish Willkie Farr and send yet another clear message to other professionals that bankruptcy courts will not tolerate the conflicts and nondisclosures that permeated the investigative aspects of these cases.

### 3. Non–Investigative/Bankruptcy Services

The conflict and disclosure problems spilled across the line to the non-investigative services, and require further reductions in the fee award. First, even if the investigation never occurred and the related conflict issues never arose, Merrill Lynch was still a party in interest because it was an account debtor of the three estates. *See Carey Transp., Inc. v. Greyhound Corp. (In re Carey Transp., Inc.),* 72 B.R. 767, 775 n. 4 (Bankr.S.D.N.Y.), *rev'd on other grounds,* 80 B.R. 646 (S.D.N.Y.1987). Hence, Willkie

Farr would still have to disclose its connection to Merrill Lynch.

Second, it is impossible to separate completely the tainted investigation from the subsequent settlements with the other broker-dealers. The trustee's final report identified causes of action against several of the broker-dealers. Most of those broker-dealers filed claims against one or more of the estates. Willkie Farr negotiated settlements with many of the broker-dealers, generally netting out all or a substantial portion of the causes of action identified in the trustee's final report against the claims filed by the broker-dealers. (*See Disclosure Statement for the Trustee's Third Amended Joint Plan of Liquidation for the Debtors,* dated Jan. 27, 1997, at 38–45.) Willkie Farr should not have investigated the claims against the other broker-dealers because the claims implicated Merrill Lynch for the reasons already stated. It would be inconsistent to compensate Willkie Farr fully for settling causes of action it should not have been investigating in the first place.

Third, the investigative services increased the time and expense of preparing fee applications. Willkie Farr billed a total of $137,444.30 to this category. If Willkie Farr had not rendered the investigative services, which represent approximately 45% of the amount of total fees requested,[21] it would not have spent as much time preparing fee applications.

Nevertheless, equitable considerations weigh in favor of compensating a large portion of this time. Willkie Farr worked for nearly three years on these cases. It performed substantial and valuable services which were not affected by the tainted investigation. For example, the firm billed $643,337.00 in connection with the plan and the disclosure statement. In *In re Granite Partners, L.P.,* 213 B.R. 440 (Bankr.S.D.N.Y. 1997), the Court granted in part and denied in part the application by the UIC for a substantial contribution award pursuant to 11

---

**21.** According to the *Willkie Farr Fee Application,* at ¶ 15, Willkie Farr actually expended more than half of its time working on the investigation. The lower overall percentage of investigative work reflected by the fee request results from its agreement to bill the estates at a reduced rate for these services.

U.S.C. § 503(b)(3)(D) and (b)(4). The compensable services related primarily to the plan, disclosure statement and Investor Settlement which paved the way for the consensual plan. *Id.* at 451. The Court noted that UIC counsel worked with the trustee and "lent its experience to the goal of resolving many obstacles to confirmation, and thereby facilitated the successful liquidation of the three debtors." *Id.* Although this is not a substantial contribution application, Willkie Farr deserves similar credit for bringing these difficult and frequently contentious cases to successful conclusions.

In addition, Willkie Farr provided exceptional litigation services that proved valuable to the estate. It opposed, largely with success, the efforts of one investor to wrest control of significant estate claims and assert them for its personal benefit. *See Goldin v. Primavera Familienstiftung (In re Granite Partners, L.P.)*, 194 B.R. 318 (Bankr. S.D.N.Y.1996). The LAB is now prosecuting these as well as other claims for the benefit of the estates. In addition, Willkie Farr prosecuted the estates' objections to the investors' damage claims, and as a result, these claims were subordinated pursuant to 11 U.S.C. § 510(b). *See In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr.S.D.N.Y. 1997).

Under the circumstances, the Court will disallow 15% of the non-investigative fees, or a total of $385,990.57, leaving $2,187,279.90. In addition, Willkie Farr must bear the costs of the fee examiner's investigation. *In re Leslie Fay Cos.*, 175 B.R. at 539. These fees and expenses total $257,079.11. What remains is a net fee award of $1,930,200.79, or slightly more than 41% of the total fees sought. This result is consistent with those cases discussed above that, under analogous circumstances, imposed reductions of between 50% and 60%. Further, the result provides a severe sanction and hopefully deters future violations, but, at the same time, recognizes and compensates Willkie Farr for the many unquestionably exceptional services that it performed in connection with the non-investigative work.

### 4. Expenses

The only remaining question concerns Willkie Farr's expenses. It seeks a total of $495,685.31. Some courts have declined to reduce or disallow the conflicted professional's expenses if they clearly benefitted the estate. *See, e.g. In re Rusty Jones, Inc.*, 134 B.R. at 347; *In re Philadelphia Athletic Club, Inc.*, 38 B.R. 882, 884 (Bankr.E.D.Pa.1984)(citing *Woods*, 312 U.S. at 269–70, 61 S.Ct. at 497–98). This result is inappropriate, at least with respect to the investigative fees. The value of the investigation will always be subject to debate, and the Court's decision reflects a conclusion that Willkie Farr should bear its costs. There is no rationale for differentiating between the legal fees and the other expenses; the estates should not have to bear either cost.

The fee applications do not allocate the expenses between the investigative and non-investigative services. Accordingly, the Court will disallow the expenses in the same proportion that the investigative fees bear to the total fees, *i.e.*, 44.86%. *See In re Keene Corp.*, 205 B.R. 690, 706 (Bankr.S.D.N.Y. 1997). The corresponding percentage of expenses is $222,364.43, and this sum is disallowed. The balance of $273,320.88 is allowed.

In summary, Willkie Farr is awarded a final fee in the amount of $1,930,200.79. and final reimbursement of expenses in the amount of $273,320.88, for a total award of $2,203,521.67. Willkie Farr has received interim awards of fees and expenses totalling $2,371,716.17, (*Fee Examiner's Report* at 21–22), and must return the difference of $168,-194.50 to the estates.

### C. The Trustee

### 1. Introduction

While the fee examiner identified disclosure violations by the trustee, he recommended a mere slap on the wrists. Neither the LAB nor the UIC even asked for a sanction. The United States Trustee, on the other hand, asks the Court to reduce the trustee's commissions. She contends that he failed to disclose Willkie Farr's connections with Price Waterhouse and its unwillingness to sue the debtors' auditors. The Court

agrees with the United States Trustee that the trustee's disclosure violation is more serious than the other parties seem to think.

The trustee's compensation is governed by 11 U.S.C. § 326(d). It provides as follows:

(d) The court may deny allowance of compensation for services or reimbursement of expenses of the trustee if the trustee failed to make diligent inquiry into facts that would permit denial of allowance under section 328(c) of this title or, with knowledge of such facts, employed a professional person under section 327 of this title.

 Section 326(d) is derived from former chapter X Rule 10–206(b) and former General Order 44. *In re Paolino,* 80 B.R. 341, 346–47 (Bankr.E.D.Pa.1987). According to the sparse legislative history, the section "permits the court to deny compensation of a trustee if the trustee has been derelict in his duty by employing non-disinterested counsel." H.R. Rep. 95–595, at 328 (1977); *see* S. Rep. 95–989, at 38 (1978). It has rarely been invoked against a trustee. *In re Paolino,* 80 B.R. at 347 n. 9.

 In addition, Rule 2014(a), quoted *supra,* requires the trustee to disclose, "to the best of the applicant's knowledge" the proposed professional's "connections with the debtor, creditors, any other parties in interest [and] their respective attorneys and accountants." The Court can sanction the trustee to the same extent as his professionals for his own violations of Rule 2014(a). *See In re BH & P, Inc.,* 949 F.2d at 1317–18.

### 2. The Trustee's Failure to Disclose

No one questions the diligence of the trustee's inquiry. To the contrary, his diligent inquiry revealed that Willkie Farr would not sue Price Waterhouse because of Willkie Farr's own connections to Price Waterhouse and its representation of the AICPA. The trustee was prepared to overlook the Price Waterhouse issue without disclosing it to the Court. He believed that Price Waterhouse was not a Willkie Farr client, and its connection did not appear to be a "technical conflict." (*Goldin Affidavit* at ¶ 13.) In addition, the refusal to sue was not an obstacle. The issues concerning the auditor involved different facts and law, Willkie Farr suggested that the trustee could hire special counsel if the need arose, and the trustee was not aware of any claims against Price Waterhouse. (*Id.*).

The trustee broke the cardinal principle of Rule 2014(a). He arrogated to himself a disclosure decision that the Court must make. Rule 2014(a) required, even in the absence of an investigation, that the trustee disclose Willkie Farr's connections with the debtors' accountants. Here, the need for disclosure went further. The trustee knew that Price Waterhouse was a target of his own investigation. He should have understood the improper perception created by Willkie Farr investigating any accountant in light of its association with the AICPA and its policy of not suing accountants. He nevertheless decided, on his own, that the connection was not a conflict, and the refusal to sue was not an obstacle, and he concluded that he did not have to disclose it. He made a decision that was never his to make in the first place, and reached the wrong conclusion when he did.

 The failing, however, did not go beyond the initial disclosure. The fee examiner's report reflects that Willkie Farr supplied the trustee with misinformation and then no information about its relationship with Merrill Lynch or the latter's refusal to return the conflict waiver. (*Fee Examiner's Report* at 61.). As a rule, it is the duty of the attorney to disclose conflicts, and not the obligation of his client to ferret them out. *In re Smitty's Truck Stop, Inc.,* 210 B.R. 844, 850 (10th Cir. BAP 1997); *In re Western Office Partners, Ltd.,* 105 B.R. at 636 (quoting *In re King Resources Co.,* 20 B.R. 191, 200–01 (D.Colo. 1982)). In the absence of knowledge that would put a reasonable trustee on notice of a potential conflict or disclosure problem, a trustee has no duty to monitor his attorney's continuing disinterestedness.

### 3. The Amount of the Sanction Against the Trustee

 The trustee's wilful failure to disclose Willkie Farr's connection to Price Waterhouse and the AICPA, or its refusal to sue Price Waterhouse, violated Rule 2014(a).

Further, these relationships were a factor that the Court relied upon in reducing Willkie Farr's fees under section 328(c); accordingly, they provide an additional basis to reduce the trustee's commissions since the trustee employed Willkie Farr with full knowledge of these connections.

As a result of an early agreement with the creditors' committee, the trustee agreed to cap his fees at 2% of monies disbursed or turned over. The 2% totals $1,301,141.00, and represents the maximum amount that the trustee could have sought.[22] In his application for commissions, he nevertheless limited his request to $1,176,507.00, because the sum corresponded to his earlier compensation estimate filed with the Court. The United States Trustee objected to the request, and the trustee agreed to a further reduction of $65,000.00. As a result, the Court awarded a final commission in the amount of $1,111,507.00. The LAB and the UIC did not object to its payment despite the pendency of this objection, and the trustee has received this sum.

The Court sanctions the trustee in the sum of $50,000.00, and directs that he disgorge this amount to the estates. The sanction represents a reduction of slightly less than 5% of the amount awarded. Although neither the LAB nor the UIC—the beneficiaries of a reduced award—have asked for any reduction, the circumstances warrant it. The nondisclosure was wilful, and the facts kept secret were material: the trustee employed lawyers who he knew or should have known were the wrong attorneys to conduct an investigation of Price Waterhouse. Thus, the trustee bears some responsibility for the taint in this aspect of the investigation.

### D. Fong

#### 1. Introduction

As noted, Fong was hired by the trustee to measure the volatility (i.e., market "tilt") of the debtors' investments. This apparently involves the application of computer software

programs that Fong developed and sometimes licenses to others. There·is ·no issue concerning the quality of Fong's work or its analysis. (Fee Examiner's Report at 63; see Goldin Affidavit at ¶ 24.) Based upon this work, Fong seeks a final fee award of $403,-721.00 and $989.62 in reimbursed expenses. Fong also seeks an increase in the $40,000.00 cap on its compensation imposed at the time of its retention.

Two objections have been raised. First, the United States trustee contends that Fong failed to adequately disclose its existing connection with Merrill Lynch. Second, the fee examiner found that Fong repudiated its contractual obligation to provide expert testimony. Based upon this finding, the UIC also objects to the Fong application. The LAB does not object. Fong attributes this to a post-confirmation settlement it reached with the LAB. Fong did not provide a copy of the settlement agreement, but it appears that Fong agreed to license its software, at no charge, to the LAB for two years. Fong contends that the license may be worth as much as $180,000.00. (Gifford Fong Associates' Reply to Objections of the Unofficial Investors' Committee and the United States Trustee, dated Nov. 13, 1998, at ¶ 13 n. 2.)

#### 2. The Failure to Disclose

In the retention papers, Fong stated that it was retained by an accounting firm that, in turn, was retained by Merrill Lynch counsel to provide litigation support in an unrelated matter. This implied that the accounting firm would pay Fong but, it turns out, Merrill Lynch paid Fong directly for the services. The Fong retention papers concededly did not reveal that Fong would receive payments directly from Merrill Lynch.

The fee examiner concluded that Fong had made full disclosure of its connections with Merrill Lynch, (Fee Examiner's Report at 41), but the United States Trustee disagrees. She correctly points out that Fong did not disclose that it would be paid directly by

---

22. The trustee's agreement lowered the maximum amount he could have requested· under Section 326(a). The section, however, establishes the maximum compensation, and the court may award less. 3 Collier ¶ 326.02[1], at 326–4;

see, e.g., In re Lehal Realty Assocs., 112 B.R. 590, 592–93 (Bankr.S.D.N.Y.1990)(awarding interim commission of 25% of the statutory maximum to the chapter 11 trustee of a non-operating estate).

Merrill Lynch. She maintains that had she known this, she might have inquired more closely into the amount of income that Fong received from Merrill Lynch, and made a better educated assessment of the risk to the estates in retaining Fong. She reasons that fees paid by the accounting firm, on the other hand, would not appear to have any impact on Fong's performance.

The Court concludes that the failure to disclose that payments came directly from Merrill Lynch amounts to a harmless error. Fong's disclosures were undeniably correct, as far as they went. Fong was retained by the accounting firm, which, in turn, was retained by Merrill Lynch to perform litigation support. Fong's disclosure put all parties on notice of its connection with Merrill Lynch, its loyalty to Merrill Lynch, and its ability to perform services for the estates in an impartial and diligent manner. In addition, and in contrast to Willkie Farr, there is no evidence that Fong subsequently took on new Merrill Lynch matters.

The United States Trustee's distinction depends, for its force, on the implication that by paying Fong, the accounting firm would shield Fong's identity from Merrill Lynch. This anonymity would ensure that Fong would exercise independent judgment on behalf of the trustee without fear of losing future business from Merrill Lynch. Further, Fong would feel that he had less or no connection with Merrill Lynch if the accounting firm paid his bill.

The United States Trustee's assumption lacks a basis in common experience. Whether Merrill Lynch paid Fong directly or indirectly, it would doubtless have learned that Fong performed work on its behalf. In addition, Fong understood that Merrill Lynch was the ultimate client because it disclosed the connection in the first instance. In the final analysis, Fong's disclosure revealed that it was rendering services on behalf of Merrill Lynch, Merrill Lynch knew it, and would ultimately bear the cost of its services. Accordingly, the United States Trustee's disclosure objection is overruled.

### 3. Breach of Contract

◼ The more difficult issue concerns Fong's alleged breach of contract. In substance, the fee examiner and the UIC contend that Fong agreed, at the time of its retention, to provide expert testimony to the trustee. However, it thereafter reneged because it did not want to testify against Merrill Lynch.· In support, the fee examiner and the UIC point to references in the Fong retention papers that the $40,000.00 cap on Fong's compensation "would not apply to any time charges for non-investigative services if required, such as providing expert testimony." (*Fong Retention Application* at ¶ 13; *accord Fong Affidavit* at ¶ 4.) In addition, the fee examiner reasoned that it would make no sense to hire Fong to do the work regarding the market tilt of the debtors' portfolios if Fong would not provide testimony relating to its assessment.

The evidence, however, supports the opposite conclusion.[23] The trustee hired Fong to perform a specific task, to wit, to assist the trustee in evaluating the marketplace changes on the debtors' investment portfolios. (*Fong Retention Application* at ¶ 9.) The specific tasks included developing and running various computer models and consulting with the trustee on investment policies, investment practices and analytical models used to make investment decisions. (*Id.*) The trustee considered simply licensing Fong's software, but ultimately decided that it made economic sense to hire Fong as well. According to the retention application:

> The Trustee considered licensing Fong's software for use by his other professionals, but determined instead to retain Fong, inasmuch as the Trustee does not require a long-term license and the contemplated consulting arrangements offers the estates the benefits of the analysis and the availability of Fong's expert personnel at little additional cost.

(*Id.* at ¶ 12.) If the trustee intended to hire Fong to testify, he would not have considered

---

**23.** Fong contends that the fee examiner's findings are "clearly erroneous," but that is not the appropriate standard of review. The Court has reviewed the fee examiner's findings and conclusions *de novo*.

the alternative of licensing Fong's software. Further, the trustee chose to retain Fong because it was more economical than licensing the software and not because he needed his testimony. These facts compel the finding that the original retention did not contemplate Fong's testimony as part of the services it was hired to render.

Additional support for this conclusion comes from the contrasting retention application of Whitestone Capital Group ("Whitestone"). The trustee retained Whitestone, as a capital markets expert, to analyze pricing issues, and in particular, to isolate and analyze the factors affecting the comparability of securities in the prepetition market environment. (*Trustee's Reply in Support of Trustee's Applications for Orders: (A) Authorizing Retention of Whitestone Capital Group; (B) Authorizing Retention of Gifford Fong Associates; (C) Increasing Maximum Compensation Payable to Kenneth Leventhal & Co.*, dated March 14, 1995, at ¶ 5.) Unlike Fong's retention, the Whitestone retention application states that Whitestone "would provide litigation support to the Trustee and counsel respecting any claims or other matters before the court that may follow the issuance of the Trustee's Report." (*See id.* at ¶.14.)

The foregoing demonstrates that the trustee did not hire Fong to testify, and in fact, the *Goldin Affidavit* conspicuously fails to say that he did. The reference to non-investigative work, including expert testimony, in the Fong application simply makes clear that the estates would have to pay separately for these additional services should they be rendered. In other words, the $40,000.00 cap covered Fong's investigative work (*i.e.*, analyzing the portfolio tilt), and not these additional services, but nothing presented to the Court indicates that Fong was required to perform them.

In any event, the post-confirmation settlement between Fong and the LAB resolves this issue in a satisfactory way. The settlement represents a reasonable resolution of a disputed issue, to wit, whether Fong breached its contract, and gives the estates valuable services at no additional cost. Furthermore, Fong apparently agreed to the settlement

unconditionally, and did not make it depend on the outcome of the objections to its fee.

For the foregoing reasons, the Court overrules the objections to Fong's fee application. Fong is awarded $403,721.00 in compensation and $989.62 in reimbursed expenses, for an aggregate award of $404,710.62. In addition, the fee cap on his compensation is modified to the extent of the amount awarded.

Settle order on notice.